# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SEA HAWK SEAFOODS, INC., an
Alaska corporation; NON-AFA
PROCESSORS ASSOCIATION,
            *Plaintiffs-Appellants,*

                v.

GARY F. LOCKE, in his official
capacity as United States Secretary
of Commerce; UNITED STATES
DEPARTMENT OF COMMERCE;
NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION;
NATIONAL MARINE FISHERIES
SERVICE,
            *Defendants-Appellees.*

No. 07-35754

D.C. No.
CV-06-01616-JCC

OPINION

Appeal from the United States District Court
for the Western District of Washington
John C. Coughenour, District Judge, Presiding

Argued and Submitted
December 9, 2008—Seattle, Washington

Filed June 17, 2009

Before: Ronald M. Gould, Richard C. Tallman and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Callahan

## COUNSEL

Leonard J. Feldman, Michael T. Shein, Kevin P. Sullivan, Seattle, Washington, on behalf of appellants Sea Hawk Seafoods, Inc. and the Non-AFA Processors Association.

Anna T. Katselas, United States Department of Justice, Washington, D.C., on behalf of appellees Gary F. Locke, United States Secretary of Commerce; United States Department of Commerce; National Oceanic and Atmospheric Administration; and National Marine Fisheries Service.

## OPINION

CALLAHAN, Circuit Judge:

Sea Hawk Seafoods, Inc. ("Sea Hawk") and the Non-AFA Processors Association (collectively, "Plaintiffs") appeal the

district court's dismissal of their claims against the United States Secretary of Commerce ("Secretary"), United States Department of Commerce ("Commerce Department"), National Oceanic and Atmospheric Administration ("NOAA"), and National Marine Fisheries Service ("NMFS"). We consider whether the Magnuson-Stevens Fishery Conservation and Management Act's ("MSA") thirty-day statute of limitations, 16 U.S.C. § 1855(f), or the Administrative Procedures Act's ("APA") general six-year limitations period applies to Plaintiffs' challenge to regulations promulgated to implement amendments to fishery management plans. These amendments were prompted by passage of the American Fisheries Act ("AFA").[1] We also consider whether Plaintiffs have adequately alleged a "failure to act" claim under the APA against NMFS and the North Pacific Council, which is not a party here, related to the promulgation of the challenged regulations. We conclude that the MSA's thirty-day limitations period applies to bar Plaintiffs' direct challenge to the regulations and that Plaintiffs' failure to act claim is an impermissible attempt to recast its direct challenge to the regulations so as to avoid the MSA's shortened limitations period. Accordingly, we affirm the district court's dismissal of Plaintiffs' claims.

## I.

## A.

In 1976, Congress enacted the MSA, 16 U.S.C. §§ 1801-1883, in an effort to, among other things, "conserve and manage the fishery resources found off the coasts of the United States" and, in particular, within the United States' exclusive economic zone. 16 U.S.C. § 1801(b)(1); *see generally Or. Trollers Ass'n v. Gutierrez*, 452 F.3d 1104, 1108 (9th Cir. 2006). The MSA provides for the establishment of eight

---

[1]Pub. L. No. 105-277, div. C., tit. II, §§ 205-213, 112 Stat. 2681-621 to 2681-637 (Oct. 21, 1998) (codified at 16 U.S.C. § 1851 note).

Regional Fishery Management Councils ("Regional Councils") to oversee conservation and management efforts in various fisheries.[2] 16 U.S.C. § 1852(a), (h). The overall authority to implement those efforts, however, is delegated to the Secretary, who acts through NMFS and NOAA. *See id.* §§ 1853 -1854.

The Regional Councils are required to prepare and submit to the Secretary fishery management plans ("FMPs") and any amendments to such FMPs as "are necessary from time to time." *Id.* § 1852(h)(1). FMPs establish general limitations on fisheries, such as seasonal restrictions and gear limitations, in order to "achieve and maintain, on a continuing basis, the optimum yield from each fishery." *Id.* § 1801(b)(4); *see also*, *e.g.*, 50 C.F.R. pt. 679. FMPs and amendments thereto shall contain, among other things, "conservation and management measures . . . consistent with the [MSA] . . . and any other applicable law." 16 U.S.C. § 1853(a)(1)(C). Upon receipt of a FMP or an amendment, the Secretary must "publish in the Federal Registry a notice stating that the FMP or amendment is available" for a public comment period of sixty days. *Id.* § 1854(a)(1)(B). After receiving comments, the Secretary may approve, reject, or partially approve the submitted FMPs or amendments. *Id.* § 1854(a)(3). Moreover, if the appropriate council does not make a recommendation, or if the Secretary is not satisfied with the recommendation made, the Secretary can himself prepare a plan or an amendment, likewise utilizing a sixty-day comment period. *Id.* § 1854(c).

The MSA also contains a provision limiting judicial review, which is at the center of this appeal:

_____

[2]Each council is made up of "individuals who, by reason of their occupational or other experience, scientific expertise, or training, are knowledgeable regarding conservation and management, or the commercial or recreational harvest, of the fishery resources of the geographical area concerned." 16 U.S.C. § 1852(b)(2)(A).

Regulations promulgated by the Secretary under [the MSA] and actions described in paragraph (2) shall be subject to judicial review to the extent authorized by, and in accordance with, [the Administrative Procedure Act (APA)], if a petition for such review is filed *within 30 days* after the date on which the regulations are promulgated or the action is published in the Federal Register . . . .

*Id.* § 1855(f)(1) (emphasis added). The actions described in "paragraph (2)" are those "taken by the Secretary under regulations which implement a fishery management plan . . . ." *Id.* § 1855(f)(2).

## B.

Additional legislation is implicated by this appeal. In 1998, Congress enacted the American Fisheries Act, which, among other things, attempted to rationalize[3] the North Pacific Pollock Fishery by providing exclusive rights to certain companies and vessels. *See* AFA §§ 208-209. In essence, the AFA created bilateral monopolies for fishing cooperatives formed under the AFA, as well as AFA-designated processors. *See* AFA §§ 208(f)(1), 210(b)(1); *see also* Scott C. Matulich et al., *Fishery Cooperatives as an Alternative to ITQs: Implications of the American Fisheries Act*, 16 MARINE RESOURCE ECONOMICS 1, 4 (2001).

Congress recognized that this cooperative scheme could have adverse economic effects on other fisheries and non-participating processors.[4] Accordingly, the AFA calls for the

---

[3]Rationalize means to "make [an industry] more efficient by reorganizing it in such a way as to dispense with unnecessary personnel or equipment." NEW OXFORD AMERICAN DICTIONARY 1413 (Elizabeth J. Jewell & Frank Abate, eds., 2001).

[4]In discussing the bill that enacted the AFA, Senator Patty Murray stated:

North Pacific Council ("Council"), one of the Regional Councils, to recommend protections, referred to as "sideboard protections" or "sideboards," for those fisheries and processors.[5] The Council

> shall recommend for approval by the Secretary such conservation and management measures as it determines necessary to protect other fisheries under its jurisdiction and the participants in those fisheries, including processors, from adverse impacts caused by [the AFA] or fishery cooperatives in the directed pollock fishery.

AFA § 211(a); *see* 50 C.F.R. § 679.64 (referring to sideboard protections). Moreover, the AFA provides that the Council "shall" by July 1, 1999 recommend for approval by the Secretary conservation and management measures to prevent over-harvesting and to "protect processors not eligible to participate in the directed pollock fishery from adverse effects" resulting from the AFA. AFA § 211(c)(1).[6] It also authorizes

---

> While we have attempted to include at least a minimum level of protections for these other fisheries, it is clear to many of us that unintended consequences are likely. It is therefore imperative that the fishery management councils not perceive the protections provided in this bill as a statement by Congress that these are the only protections needed. In fact, the opposite is true . . . . Those of us involved intimately in the development of this legislation strongly urge the Councils to monitor the formation of fishery cooperatives closely and ensure that other fisheries are held harmless to the maximum extent possible.

144 CONG. REC. S12,696-03, S12,708 (Oct. 20, 1998) (remarks of Sen. Murray).

[5]The North Pacific Council is one of the eight Regional Councils established by the MSA. 16 U.S.C. § 1852(a)(1)(G). It encompasses the states of Alaska, Oregon, and Washington, and has authority over "the fisheries in the Arctic Ocean, Bering Sea, and Pacific Ocean seaward of Alaska." *Id.*

[6]Section 211(c)(1) of the AFA states, in part:

  (1) Required council recommendations.—By not later than July

the Secretary to take action if the Council does not make recommendations or if the Secretary determines that the Council's recommendations are inadequate.[7] *Id.*

## C.

The present action focuses on certain regulations promulgated by NMFS in December 2002 ("2002 Regulations"), which concern four amendments to FMPs and their implementing regulations.[8] *See* 67 Fed. Reg. 79,692-79,739 (Dec.

---

1, 1999, the North Pacific Council shall recommend for approval by the Secretary conservation and management measures to—

(A) prevent the catcher vessels eligible under subsections (a), (b), and (c) of section 208 [of this note] from exceeding in the aggregate the traditional harvest levels of such vessels in other fisheries under the authority of the North Pacific Council as a result of fishery cooperatives in the directed pollock fishery; and

(B) protect processors not eligible to participate in the directed pollock fishery from adverse effects as a result of this Act [American Fisheries Act, Pub.L. 105-277, Div. C, Title II, Oct. 21, 1998, 112 Stat. 2681-616] or fishery cooperatives in the directed pollock fishery.

[7]Section 211(c)(1) continues:

If the North Pacific Council does not recommend such conservation and management measures by such date, or if the Secretary determines that such conservation and management measures recommended by the North Pacific Council are not adequate to fulfill the purposes of this paragraph, the Secretary may by regulation restrict or change the authority in section 210(b) [of this note] to the extent the Secretary deems appropriate, including by preventing fishery cooperatives from being formed pursuant to such section and by providing greater flexibility with respect to the shoreside processor or shoreside processors to which catcher vessels in a fishery cooperative under section 210(b) [of this note] may deliver pollock.

[8]The summary to the amendments notes:

The management measures include: measures that allocate the Bering Sea and Aleutian Islands Management Area (BSAI) pol-

30, 2002) (codified in various sections of 50 C.F.R. pt. 679). Plaintiffs were concerned that although the 2002 Regulations provided some protections for non-AFA "shoreside processors"[9] against unfair competition related to pollock fishing, the regulations did not provide adequate sideboard protections for non-AFA shoreside processors with respect to other types of fish, such as salmon. In particular, Plaintiffs complained that these regulations did not restrict AFA-related "floating shoreside processors"[10] from leaving a single geographic location in Alaskan waters after the pollock fishing season and relocating to Prince William Sound, Alaska to process salmon, which would impact Sea Hawk's business. In 1999, Sea Hawk had advised the Council of its concerns as an established non-AFA shoreside salmon processor located in Prince William Sound regarding "the anticipated encroachment of AFA-owned or controlled processing vessels into [Prince William Sound]." Sea Hawk alleged that "allowing AFA-

---

lock among the sectors of the pollock processing industry and restrict who may fish for and process pollock within each industry sector; measures that govern the formation and operation of fishery cooperatives in the BSAI pollock fishery; harvesting and processing limits known as sideboards to protect the participants in other fisheries from spillover effects resulting from the rationalization of the BSAI pollock fishery; measures that establish catch weighing and monitoring requirements for vessels and processors that participate in the BSAI pollock fishery; and extension of the inshore/offshore regime for pollock and Pacific cod in the Gulf of Alaska (GOA) through December 31, 2004.

67 Fed. Reg. at 79,692.

[9]"Shoreside processor" is defined as "any person or vessel that receives, purchases, or arranges to purchase, unprocessed groundfish, except catcher/processors, motherships, buying stations, restaurants, or persons receiving groundfish for personal consumption or bait." 50 C.F.R. § 679.2; *see also* AFA § 205(12).

[10]A "floating shoreside processor" or "stationary floating processor" is defined as "a vessel of the United States operating as a processor in Alaska State waters that remains anchored or otherwise remains stationary in a single geographic location while receiving or processing groundfish harvested in the GOA or BSAI." 50 C.F.R. § 679.2.

created surplus processor ships to enter any Alaska salmon fishery jeopardizes and devalues the established shoreside facilities' investments and development."

The 2002 amendments were developed over a three-year period and involved twelve Council meetings as well as "numerous other public meetings." 67 Fed. Reg. at 79,692. Regarding the provision of notice and a public comment period, the background section to the final rule explains that:

> [w]hile [these amendments] were under development, the deadlines and statutory requirements of the AFA were met on an interim basis through several emergency interim rules.[11] The final [Environmental Impact Statement] for [the amendments] contains a summary of the extensive public process involved in the development of the amendments and describes the AFA-related rulemaking completed [up to December 2002]. The proposed rule for [the amendments] was published on December 17, 2001 (66 FR 65028), with comments invited through January 31, 2002. NMFS received 12 letters of comment by the end of the comment period on the proposed rule, many of which contained extensive comments on various sections of the proposed rule. A notice of availability of [the amendments] was published on November 27, 2001 (66 FR 59225), with comments on the Amendments invited through January 28, 2002. NMFS received one comment letter on the amendments that supported approval and no comments that recommended disapproval.

*Id*. The summary included with the final rule states that these

---

[11] *See* 16 U.S.C. § 1855(c) (giving the Secretary the authority to promulgate emergency regulations or interim measures, and providing that such regulations or measures shall remain in effect for not more than 180 days).

amendments and management measures were necessary "to implement the AFA" and were intended to do so "in a manner consistent with the environmental and socioeconomic objectives of AFA, the [MSA], and other applicable laws." 67 Fed. Reg. at 79,692. The 2002 Regulations also note that they "were developed by NMFS and the Council under the Magnuson-Stevens Act and American Fisheries Act (AFA) to govern commercial fishing for BSAI pollock according to the requirements of the AFA." *Id.* at 79,721 (codified as amended at 50 C.F.R. § 679.1).

Although the AFA required the Council to recommend sideboards for both non-AFA catcher vessels and processors, AFA § 211(c)(1), the Council decided not to take any action with regard to the non-AFA processors, explaining:

> With respect to non-pollock groundfish processing sideboards, the Council took no action. The Council believed that placing non-pollock groundfish processing limits on AFA processors could have negative effects on markets for both AFA and non-AFA catcher vessels. In addition, the Council concluded that its suite of harvesting sideboard restrictions on AFA catcher vessels and catcher/processors also serve to protect non-AFA processors in the BSAI, which are primarily non-AFA catcher/processors. Instead of imposing non-pollock processing limits on AFA processors, the Council indicated its intent to explore revisions to its Improved Retention/Improved Utilization program set out at 50 CFR 679.27. Testimony from non-AFA processors indicated that such changes could be a more effective means of providing a more level playing field for non-AFA catcher/processors.

66 Fed. Reg. at 59,228.

Plaintiffs challenged the Council's decision not to act. In a 2006 letter to NMFS, they requested that NMFS rescind part

of its 2002 Regulations and take appropriate action to protect the non-AFA processors as required by the AFA. In reply, NMFS disputed the application of the AFA to Plaintiffs, noting that the AFA only provides for protection of "other fisheries under [the Council's] jurisdiction." According to NMFS, Plaintiffs, who are located in the territorial sea/internal waters of Alaska, are not within the Council's jurisdiction under either the AFA or MSA.

**D.**

On November 8, 2006, nearly four years after the 2002 Regulations were promulgated, Plaintiffs filed a complaint for declaratory and injunctive relief against the Secretary, the Commerce Department, NOAA, and NMFS (collectively, the "Agency"). The complaint challenged the 2002 Regulations and alleged that the Agency failed to act as required by the AFA.

The Agency filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), asserting that Plaintiffs' action was untimely filed under the MSA's thirty-day limitations period. The district court granted the Agency's motion to dismiss and dismissed the lawsuit with prejudice. The court concluded that the 2002 Regulations were issued pursuant to the MSA because they "were developed, published for review, and promulgated under the [MSA's] statutory procedures and by authority delegated to NMFS as part of the [MSA's] overall regulation of the federal fisheries." As a result, the dismissal was compelled by the thirty-day limitations period in 16 U.S.C. § 1855(f). The district court also rejected Plaintiffs' claim that NMFS failed to implement measures mandated by the AFA.

**II.**

We review de novo a dismissal for lack of subject matter jurisdiction. *Ctr. for Biological Diversity v. Veneman*, 394

F.3d 1108, 1110 (9th Cir. 2005). We also review de novo a dismissal based on the running of a statute of limitations. *Ellis v. City of San Diego*, 176 F.3d 1183, 1188 (9th Cir. 1999). We may affirm "on any proper ground supported by the record," *Papa v. United States*, 281 F.3d 1004, 1009 (9th Cir. 2002), but we assume that the material facts alleged in the complaint are true. *Rhoades v. Avon Prods.*, 504 F.3d 1151, 1156 (9th Cir. 2007).

## III.

Plaintiffs first argue that the district court erred by applying the MSA's thirty-day statute of limitations instead of the general, six-year statute of limitations that otherwise applies to challenges under the APA. *Compare* 16 U.S.C. § 1855(f)(1), *with Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 438 F.3d 937, 942-43 (9th Cir. 2006) ("Although the APA itself contains no specific statute of limitations, a general six-year civil action statute of limitation applies to challenges under the APA."). They contend that the MSA's expedited review period does not apply to the 2002 Regulations because they were promulgated under the AFA, not the MSA.

[1] Challenges to "[r]egulations promulgated by the Secretary" under the MSA must be brought "within 30 days after the date on which the regulations are promulgated . . . ."[12] 16 U.S.C. § 1855(f)(1); *see also Turtle Island*, 438 F.3d at 944 (stating that "the thirty-day time limit applies whenever a party challenges '[r]egulations promulgated by the Secretary under the [Magnuson Act]' " (alterations in original, citation omitted)). This is a "strict jurisdictional" requirement that cannot be avoided "through careful pleading." *Turtle Island*,

---

[12]Regulations are "promulgated" within the meaning of section 1855(f)(1) when published in the Federal Register. *Turtle Island*, 438 F.3d at 943-44 (citing *Nw. Envtl. Def. Ctr. v. Brennen*, 958 F.2d 930, 934 (9th Cir. 1992)).

438 F.3d at 945 (citation and internal quotation marks omitted). Because there is no dispute that Plaintiffs' complaint directly challenges the substance of the 2002 Regulations and was filed more than thirty days after those regulations were promulgated, the narrow question here is whether the 2002 Regulations were promulgated under the MSA. *See id.* at 948 ("Section 1855(f) applies only to . . . claims . . . that clearly challenge regulations promulgated under the Magnuson Act.").

**[2]** We conclude that the 2002 Regulations were promulgated, at least in part, under the MSA. Although the Agency's final rule indicates that the 2002 Regulations were intended to "implement" certain AFA-related amendments, 67 Fed. Reg. at 79,692, the "purpose and scope" section of the final rule plainly states that the regulations "were developed by NMFS and the Council under the Magnuson-Stevens Act and American Fisheries Act." 67 Fed. Reg. at 79,721 (codified as amended at 50 C.F.R. § 679.1(k)). Furthermore, as the district court stated, the 2002 Regulations were "developed, published for review, and promulgated" pursuant to the MSA's procedures. For example, in accordance with the MSA's requirements, *see* 16 U.S.C. § 1854(a), the 2002 Regulations were published by the Secretary upon receipt, and a public comment period of sixty days was provided.[13] 67 Fed. Reg. at 79,692. The November 2001 notice and request for public comment regarding the proposed amendments also indicates that NMFS would review the proposed rule implementing the amendments to the FMPs under MSA procedures. 66 Fed. Reg. at 59,228. Based on the foregoing, we conclude that although the 2002 Regulations were intended to implement AFA-related amendments, the regulations were promulgated under the MSA, even if in part.[14] Accordingly, the thirty-day

---

[13]Plaintiffs' opening brief acknowledges that NMFS followed the MSA's notice and comment procedures, but contends without supporting authority that this fact is of "*de minimus*" value.

[14]The nature of the relationship between the MSA and the AFA is such that a challenge to the Secretary's actions or inactions under the AFA with

review period bars as untimely Plaintiffs' challenge to the regulations.

We note, in passing, that application of the MSA's thirty-day statute of limitations to Plaintiffs' complaint is not particularly unfair. Plaintiffs had notice of the proposed amendments to the FMPs as early as 1999 and voiced concerns to the Council regarding the impact of the regulations on salmon processors in Prince William Sound. Thus, Plaintiffs cannot legitimately claim surprise regarding the promulgation of the 2002 Regulations and the need to immediately file any suit challenging these regulations.

## IV.

**[3]** We also reject Plaintiffs' challenge to the district court's dismissal of their "failure to act" claim alleged pursuant to the APA, 5 U.S.C. §§ 551, 702, 706(1). Their failure to act claim is an improper attempt to plead around the MSA's thirty-day statute of limitations because the essence of their complaint remains that the Secretary failed to conform to his responsibilities under the AFA and/or the MSA with regard to the specific regulations enacted.

**[4]** Although Plaintiffs' briefs on this issue lack clarity, their reply brief asserts that the "failure to act was the Council's failure to recommend sideboards to 'protect processors not eligible to participate in the directed pollock fishery from adverse effects as a result of this Act [the AFA] . . . , and

respect to FMP amendments is likely to invoke the MSA. The MSA is the vehicle through which regulations implementing FMP amendments are promulgated. *See* 16 U.S.C. §§ 1853-1854. The MSA also requires that FMPs be consistent with other applicable law, which would include the AFA. 16 U.S.C. § 1853(a)(1)(C). Accordingly, in order for the MSA's limited judicial review period to have any meaning, it must apply to actions that—like the one here—necessarily challenge the Secretary's obligations under the MSA.

NMFS's failure to recognize its power over salmon processor sideboards." In other words, their real complaint is that the 2002 Regulations do not adequately protect shoreside salmon processors like Sea Hawk from floating shoreside processors that might begin processing salmon after conclusion of the pollock season. Specifically, Plaintiffs disagree with the Council's perspective that other sideboard protections would adequately protect non-AFA processors. *See* 66 Fed. Reg. at 59,228. Regardless of the merits of the dispute, Plaintiffs' challenge is to the substance of the 2002 Regulations. Accordingly, the MSA's thirty-day, jurisdictional statute of limitations applies and bars Plaintiffs' lawsuit despite Plaintiffs' characterization of their claim as a failure to act claim. *Cf. Am. Bird Conservancy v. FCC*, 545 F.3d 1190, 1193 (9th Cir. 2008) (rejecting plaintiffs' attempt to plead a direct challenge to an order of the FCC as a failure to act claim).

[5] If Plaintiffs' failure to act claim were construed as not being a challenge to the promulgation of a specific regulation but rather as a claim that the Secretary had failed to fulfill his overall obligations under the AFA to protect salmon processors, it still would not state a judicially cognizable claim. The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof," 5 U.S.C. § 702, and that a reviewing court has the power to "compel agency action unlawfully withheld." *Id.* § 706(1).[15] However, the United States Supreme Court has held that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is *required to* take." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004).

---

[15]The term "agency action" refers to "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

**[6]** Here, the Secretary was not *required* to enact at least some level of protection for salmon processors. The text of AFA § 211(c)(1) provides that if the Council does not make protection recommendations or makes recommendations that are not satisfactory, the Secretary "*may* by regulation restrict or change the authority in section 210(b) . . . to the extent the Secretary deems appropriate . . . ." AFA § 211(c)(1) (emphasis added). Because the word "may" implies discretion, there is no legally *required* action imposed on the Agency. *See Norton*, 542 U.S. at 64 (noting that a court can only compel an agency "to perform a 'ministerial or non-discretionary act' " (citation omitted)).

**[7]** Also, the alleged requirement that the Secretary at least "consider" imposing some sanctions is similarly not discrete or legally required. We have previously rejected the argument that a requirement "to consider" can give rise to an enforceable duty. *See Ctr. for Biological Diversity*, 394 F.3d at 1113 (finding no enforceable duty where the agency had to consider "57 potentially eligible rivers while planning for the use and development of water and related land resources" (citing *Norton*, 542 U.S. at 64-65)). Moreover, as the Supreme Court noted in *Norton*, "[g]eneral deficiencies in compliance . . . lack the specificity requisite for agency action."**[16]** *Norton*, 542

---

**[16]**In *Norton*, the Court was concerned with courts infringing upon the discretion delegated to the agencies:

> The principal purpose of the APA limitations we have discussed—and of the traditional limitations upon mandamus from which they were derived—is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve. If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management.

542 U.S. at 66-67.

U.S. at 66 (rejecting the claim based on the requirement that the agency " 'manage . . . in a manner so as not to impair the suitability of [certain] areas for preservation as wilderness' " (citation omitted)). Thus, the Secretary's alleged "failure to consider" is not actionable under Section 706(1).

## V.

We conclude that Plaintiffs' complaint challenging the 2002 Regulations is governed by the MSA's thirty-day statute of limitations and is thus time-barred. We also conclude that Plaintiffs' complaint cannot be rendered timely through Plaintiffs' attempt to recast their substantive challenges to these regulations as a failure to act claim. Accordingly, the district court is **AFFIRMED**.