**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| PACIFIC CHOICE SEAFOOD COMPANY; SEA PRINCESS, LLC; PACIFIC FISHING, LLC, *Plaintiffs-Appellants*, <br><br> v. <br><br> WILBUR ROSS, U.S. Secretary of Commerce; NATIONAL MARINE FISHERIES SERVICE, *Defendants-Appellees*. | No. 18-15455 <br><br> D.C. No. 4:15-cv-05572-HSG <br><br><br> OPINION |

Appeal from the United States District Court
for the Northern District of California
Haywood S. Gilliam, Jr., District Judge, Presiding

Argued and Submitted December 4, 2019
San Francisco, California

Filed September 25, 2020

Before: Sidney R. Thomas, Chief Judge, and William A.
Fletcher and Eric D. Miller, Circuit Judges.

Opinion by Judge Miller

## SUMMARY[*]

### Magnuson-Stevens Fishery Conservation and Management Act

The panel affirmed the district court's summary judgment entered in favor of the National Marine Fisheries Service in an action brought by Pacific Choice Seafood Company challenging the Service's rule imposing a quota system for the Pacific non-whiting groundwater fishery, limiting the total allowable catch and prohibiting any one entity from controlling more than 2.7 percent of the outstanding quota share.

In 2015, the Service determined that Pacific Choice and related entities together owned or controlled at least 3.8 percent of the quota share. Acting under the Magnuson-Stevens Fishery Conservation and Management Act of 1976 (the "Act"), the Service ordered Pacific Choice to divest its excess share.

The panel held that Pacific Choice's suit was timely because it was brought within 30 days of the Service's publication of the 2015 rule requiring divestiture. 16 U.S.C. § 1855(f)(1).

In challenging the 2.7 percent quota share limit, first, Pacific Choice argued that the Service misinterpreted the term "excessive share" in 18 U.S.C. § 1853a(c)(5)(D) by sidelining considerations of market power in favor of per-

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

vessel profitability. Because the Act was ambiguous as to what factors the Service must consider in setting a maximum share, the panel turned to step two of the framework set forth in *Chevron U.S.A. Inc. v. NRDC, Inc*., 467 U.S. 837 (1984), and considered whether the Service adopted a "reasonable interpretation" of the statute. The panel held that it was reasonable for the Service to conclude that other factors can dictate a lower maximum share than might be required by a singular focus on preventing excessive market power.

Second, Pacific Choice argued that the Service acted arbitrarily and capriciously by failing to consider all relevant factors and relying on insufficient analysis in choosing the 2.7 percent limit. The panel held that the record showed that the Service considered market power. The panel further held that the Service engaged in a reasoned process from which its path to the 2.7 percent limit may reasonably be discerned. The panel held that Pacific Choice's interpretation of the administrative record was not persuasive. The panel concluded that the Service did not act arbitrarily or capriciously in setting the 2.7 percent maximum share.

The panel rejected Pacific Choice's statutory and Administrative Procedure Act challenges to the Service's control rule. The Act requires that the Service "establish [] a maximum share . . . that a [share] holder is permitted to hold, acquire, or use." 16 U.S.C. § 1853a(c)(5)(D)(i). The Service interpreted "hold, acquire, or use" to include "control" and defined "control" to include, among other things, "the ability through any means whatsoever to control or have a controlling influence over the entity to which [quota share] is registered." 50 C.F.R. § 660.140(d)(4)(iii)(H). The panel held that its review of the Service's interpretation of the rule was governed by *Chevron* analysis, and the panel saw nothing in the statute that

unambiguously foreclosed the Service's approach. The panel further held that the rule was not arbitrary or capricious.

## COUNSEL

Ryan P. Steen (argued) and Jason T. Morgan, Stoel Rives LLP, Seattle, Washington, for Plaintiffs-Appellants.

David Gunter (argued) and Bridget Kennedy McNeil, Attorneys; Eric Grant, Deputy Assistant Attorney General; Jeffrey Bossert Clark, Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice; Maggie B. Smith, Office of the General Counsel, National Oceanic and Atmospheric Administration, Washington, D.C.; for Defendants-Appellees.

## OPINION

MILLER, Circuit Judge:

In 2010, the National Marine Fisheries Service implemented a quota system for the Pacific non-whiting groundfish fishery, one of several stocks of fish that the Service administers in the Pacific Ocean. Acting under the Magnuson-Stevens Fishery Conservation and Management Act of 1976, 16 U.S.C. §§ 1801–1891d (the Magnuson-Stevens Act or the Act), the Service imposed a quota limiting the total allowable catch, divided it among the participants in the fishery, and prohibited any one entity from "own[ing] or control[ling]" more than 2.7 percent of the outstanding quota share. 50 C.F.R. § 660.140(d)(4)(i). The Service

defined "control" to include "the ability through any means whatsoever to control or have a controlling influence over" an entity with quota share. *Id.* § 660.140(d)(4)(iii)(H).

In 2015, the Service determined that Pacific Choice Seafood Company and related entities (collectively, Pacific Choice) together owned or controlled at least 3.8 percent of the quota share. After the Service ordered Pacific Choice to divest its excess share, Pacific Choice brought this action, alleging that the Service's 2.7 percent maximum share and its "control" rule exceeded its authority under the Magnuson-Stevens Act and violated the Administrative Procedure Act. The district court granted summary judgment to the Service. We affirm.

I

Congress enacted the Magnuson-Stevens Act to prevent overfishing and to ensure that "fisheries [are] conserved and maintained so as to provide optimum yields on a continuing basis." 16 U.S.C. § 1801(a)(5). The Act establishes eight regional fishery management councils, each of which is charged with developing a "fishery management plan" for the fisheries in its region. *Id.* § 1852(a)(1), (h)(1). A management plan must prescribe measures "necessary and appropriate for the conservation and management of the fishery." *Id.* § 1853(a)(1), (b)(3). Once a council develops a plan, the Secretary of Commerce must evaluate it and either approve or reject it. *Id.* § 1854(b)(1). The Secretary has delegated that responsibility to the Service. *See Pacific Dawn LLC v. Pritzker*, 831 F.3d 1166, 1170 (9th Cir. 2016).

In 1990, the regional fishery councils began to regulate some fisheries by adopting quota programs under which the councils divided up the total allowable catch and gave participants in the fishery the right to harvest a specified

quantity of fish. *See Pacific Coast Fed'n of Fishermen's Ass'ns v. Blank*, 693 F.3d 1084, 1087 (9th Cir. 2012). Such programs proved controversial, and in 1996, Congress imposed a temporary moratorium on new quota programs. Sustainable Fisheries Act, Pub. L. No. 104-297, § 108(e), 110 Stat. 3559, 3576–77 (1996). In 2007, after the National Academy of Sciences concluded that quota programs "can be effective solutions to a host of fishery-related problems, including economic inefficiency, overcapitalization . . . and overfishing," Congress reauthorized new quota programs, which it called "limited access privilege programs." *Pacific Coast*, 693 F.3d at 1087–88; *see* Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006, Pub. L. No. 109-479, § 106, 120 Stat. 3575, 3586 (2007).

Congress set out several requirements for limited access privilege programs. Most relevant here, a council must ensure that no one entity acquires "an excessive share" of the total privileges. 16 U.S.C. § 1853a(c)(5)(D). To that end, a council must establish "a maximum share, expressed as a percentage of the total limited access privileges, that a limited access privilege holder is permitted to hold, acquire, or use," along with "any other limitations or measures necessary to prevent an inequitable concentration of limited access privileges." *Id.*

This case involves the limited access privilege program for the Pacific non-whiting groundfish fishery. As their name suggests, groundfish live near the bottom of the ocean. *See West Coast Groundfish*, National Oceanic and Atmospheric Administration, https://www.fisheries.noaa.gov/species/west-coast-groundfish. The fishery consists of more than 90 species of groundfish in the Pacific Ocean off the coast of California, Oregon, and Washington, including

lingcod, sablefish, sole, and rockfish, but not including the Pacific whiting, or hake, which is regulated separately. *See* 50 C.F.R. § 660.140, table 1 to paragraph (d)(1)(ii)(D). The relevant regional council for the fishery is the Pacific Fishery Management Council, which has representatives from California, Oregon, Washington, and Idaho, as well as from Indian tribes with federally recognized fishing rights in those States. 16 U.S.C. § 1852(a)(1)(F).

Even before Congress reauthorized limited access privilege programs in 2007, the Council had started to implement a rationalization program for the Pacific fisheries it manages. In this context, "rationalization" means avoiding overcapacity—the presence of more fishing vessels than necessary to catch a sustainable number of fish—by, among other things, reducing the number of vessels operating in the Council's fisheries. In addition to reducing overfishing, the Council aimed to "increase net economic benefits" from its fisheries and to create "individual economic stability" for vessels that operated within them. *Pacific Coast*, 693 F.3d at 1089.

The Council's years-long deliberative process began with the Trawl Individual Quota Committee, a committee of industry representatives formed to analyze possible quota limits on both an aggregate and per-species level. In 2003, relying on data from aggregate average catches from 1994 to 2003, the Quota Committee proposed several possible limits on the aggregate quota share that could be held by any one entity, ranging from 1.5 to 5 percent of the total allowable catch.

After the Quota Committee completed its analysis, the Groundfish Allocation Committee reviewed the recommendations and "added three options for the Council's consideration," ranging from the average maximum share

for the 1994–2003 period to 1.5 times those limits. The Allocation Committee's report paid particular attention to the "maximum fleet consolidation level" that each option would create—in other words, how much market concentration would result. Part of the Allocation Committee's analysis involved calculating a Herfindahl-Hirschman index, or "HHI," a measure of market concentration commonly employed in the antitrust context. *See Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 786 (9th Cir. 2015). That analysis suggested that the Council could set aggregate catch limits up to about 18 percent without creating anticompetitive effects in the fishery.

But after significant deliberation among the Quota Committee, the Allocation Committee, and the Council, the Allocation Committee failed to agree on a single recommendation. After proposing two new options, the Allocation Committee asked yet another committee—the Groundfish Management Team—to evaluate all of the options that had been proposed.

The Management Team began by noting that while "[a]ntitrust concerns define the upper extreme of where limits can be set," fishing quotas are also "a tool for balancing the Council's social objectives against the undesired effects of the . . . drive toward increased economic efficiency." In contrast to the Quota Committee and the Allocation Committee, which had focused on aggregate revenues, the Management Team focused on per-vessel profitability. It analyzed historical data on a per-vessel basis to determine the current profitability of the fishery. It then projected profitability based on varying fleet sizes, and it cautioned that "concerns about control" resulting from higher quota share maximums "go beyond revenues" and

involve "other issues such as bargaining, market power, and types of relationships that may influence the operation of the fishery." In light of its conclusion that a fleet size of 40 to 50 vessels would provide optimal profitability while minimizing "control and consolidation of quota ownership," the Management Team presented possible maximum quota shares ranging from approximately 1.3 to 3.8 percent but ultimately recommended a limit of 2.3 to 2.7 percent depending on the desired amount of consolidation.

The Management Team's per-vessel approach mostly won out. In March 2009, the Groundfish Advisory Subpanel evaluated proposals from the Management Team and the Allocation Committee and issued a brief report. The Advisory Subpanel acknowledged the "trade-off" recognized by the Management Team "between preventing excessive market control . . . and the lower revenues and efficiency associated with control limits that are set too low." It recommended a 2.7 percent maximum aggregate quota share, which it noted was the "mid range of the data" in the Management Team's report. The Advisory Subpanel did not completely adopt the Management Team's recommendations; some of its proposed limits for individual species instead matched the Allocation Committee's recommendations, or proposed a limit not recommended by either committee.

After further deliberation on several matters not at issue here, the Council proposed Amendment 20 to the overall fishery plan implementing the limited access privilege program, including the 2.7 percent aggregate catch limit. 75 Fed. Reg. 53,380 (Aug. 31, 2010); 75 Fed. Reg. 32,994 (June 10, 2010). The Service approved the plan in August 2010 with some technical changes, and it finalized the relevant rules in October and December of that year. *See*

75 Fed. Reg. 78,344 (Dec. 15, 2010); 75 Fed. Reg. 60,868 (Oct. 1, 2013). The Service and the Council also jointly published a final environmental impact statement containing an extensive discussion of the agency's development of the limited access privilege program.

At the same time, the Service adopted a "control" rule to enforce the provision of section 1853a that prohibits anyone with limited access privileges from "hold[ing], acquir[ing], or us[ing]" any quota share exceeding the regulatory maximum. 16 U.S.C. § 1853a(c)(5)(D)(i); *see* 75 Fed. Reg. at 60,954–55. In the final rule, the Service interpreted section 1853a as authorizing it to prohibit permit holders from "own[ing] or control[ling]" quota share above the maximum. 50 C.F.R. § 660.140(d)(4)(i)(A). It then defined "control" as, among other things, the "ability through any means whatsoever to control or have a controlling influence" over an entity holding quota share. 50 C.F.R. § 660.140(d)(4)(iii)(H).

Not everyone welcomed the new rule. Pacific Choice operates a seafood-processing facility in Eureka, California, and indirectly controls several vessels that participate in the fishery. After significant delay while the Service worked out divestiture procedures for entities holding excess share, the Service eventually implemented the 2010 rule and notified Pacific Choice that it held at least 3.8 percent of the fishery's quota share. That share exceeded the 2.7 percent maximum and triggered the divestiture provisions. *See* 50 C.F.R. § 660.140(d)(4)(v). The Service issued various moratoria on the requirement to transfer excess quota share after an initial allocation, but in November 2015, it issued a final rule requiring divestiture. *See* 80 Fed. Reg. 69,138 (Nov. 9, 2015).

Pacific Choice complied with the divestiture requirement and brought this action against the Service soon thereafter. On cross-motions for summary judgment, the district court granted summary judgment for the Service, concluding that Pacific Choice had not established that either the 2.7 percent maximum share or the Service's control rule violated the Act or the APA.

II

We begin by considering whether we have jurisdiction to hear this case. Neither party has raised the issue, but we have a duty to determine whether we have jurisdiction, "even though the parties are prepared to concede it." *Spencer Enters., Inc. v. United States*, 345 F.3d 683, 687 (9th Cir. 2003) (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986)).

The question is whether Pacific Choice's suit was timely. The Act requires any challenge to agency actions or "[r]egulations promulgated by the Secretary" to be filed within 30 days of "the date on which the regulations are promulgated or the action is published in the Federal Register." 16 U.S.C. § 1855(f)(1). We have held that the Act's time limits are jurisdictional. *See Sea Hawk Seafoods, Inc. v. Locke*, 568 F.3d 757, 765 (9th Cir. 2009). There is reason to doubt whether that characterization is consistent with more recent Supreme Court decisions, which have clarified that filing deadlines are generally non-jurisdictional claim-processing rules. *See*, *e.g.*, *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434–36 (2011). But even under the Court's newer, more restrictive approach, at least some time limits for claims against the government remain jurisdictional. *See John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 139 (2008). Our prior cases are not "clearly irreconcilable" with any intervening Supreme

Court decision, and we remain bound by them. *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc).

Pacific Choice filed suit on December 4, 2015, which obviously was more than 30 days after the Service's 2010 rule. The lawsuit also came more than 30 days after the Service enforced the 2010 rule against Pacific Choice through its July 28, 2015 letter.

We nevertheless conclude that Pacific Choice's suit was timely because it was brought within 30 days of the Service's publication of the 2015 rule requiring divestiture. A timely challenge to an agency's action "may challenge both the action and the regulation under which the action is taken." *Oregon Troller's Ass'n v. Gutierrez*, 452 F.3d 1104, 1113 (9th Cir. 2006). The 2015 rule constituted an "action," which the Act defines to include any "actions . . . taken by the Secretary under regulations which implement a fishery management plan." 16 U.S.C. § 1855(f)(2); *see also Oregon Troller's Ass'n*, 452 F.3d at 1115–16. And although Pacific Choice does not reassert on appeal the challenges it raised below to the 2015 rule, if it prevailed in this case, it could regain the share it was required to divest. We therefore conclude that Pacific Choice's suit was timely under section 1855(f)(1). *See Oregon Troller's Ass'n*, 452 F.3d at 1113–14; *see also California Sea Urchin Comm'n v. Bean*, 828 F.3d 1046, 1049 (9th Cir. 2016).

### III

Pacific Choice raises two challenges to the 2.7 percent quota share limit. First, it argues that the Service misinterpreted the term "excessive share" in section 1853a(c)(5)(D) by sidelining considerations of market power in favor of per-vessel profitability. Second, it argues that the Service acted arbitrarily and capriciously by failing

to consider all relevant factors and relying on insufficient analysis in choosing the 2.7 percent limit. We review the district court's decision de novo, *see Pacific Dawn*, 831 F.3d at 1173, and we reject both challenges.

A

We begin with Pacific Choice's argument that the 2.7 percent maximum share contravenes the Magnuson-Stevens Act. At the outset, we acknowledge some uncertainty as to exactly what Pacific Choice believes the Service's interpretive error to be. In its opening brief, Pacific Choice asserted that "'[e]xcessive share,' as used in 16 U.S.C. § 1853a(c)(5)(D) . . . means 'conditions of monopoly or oligopoly,'" and that the Service violated the Act because it "relied on . . . factors outside the scope of [section 1853a(c)(5)(D)] by setting a maximum share that reflected 'a chance of generating a reasonable profit.'" That language suggests that it is improper for the Service to consider any factors other than market power, or at least that it is improper for the Service to consider whether a maximum share will allow reasonable profits. But in its reply brief, Pacific Choice rejected that suggestion as "a straw man," disclaiming the argument that the Service "may *only* consider market power" and arguing instead that "market power is *an essential and indispensable factor*" for determining a maximum share, which the Service ignored by "bas[ing] the limit *solely on other factors*."

To the extent Pacific Choice means that market power is one of many factors that the Service must consider, we do not think the Service disagrees. To the contrary, when asked at oral argument if the Service is required to consider market power, counsel for the Service said yes. And in promulgating the 2010 rule, the Service explained that the Council had "considered a wide range of factors such as social benefits,

impact on labor, impacts on processors, impacts on harvesters, impacts on the public, the number and sizes of firms, within-sector competition, *market power*, efficiency, geographic distribution, communities, and fairness and equity." 75 Fed. Reg. at 33,004 (emphasis added). The Service advanced a similar interpretation in a 2007 guidance document instructing fishery councils to consider "market power including monopoly . . . or monopsony" in designing limited access privilege programs.

Pacific Choice appears to believe, however, that considering market power as one of several factors is not enough. Instead, we understand Pacific Choice's statutory argument to be that whatever limit the Service sets, it must in some sense be "based on" market-power considerations. In other words, Pacific Choice's argument implies that it would be improper for the Service to determine that a particular limit would prevent any market participant from exercising market power but then to set a lower limit that reflects other considerations. We note that where, as here, market power could be avoided with a higher limit than is needed to achieve other objectives, Pacific Choice's position is not so different, in practice, from a rule that the Service may consider only market power.

In assessing Pacific Choice's statutory argument, we apply the framework of *Chevron U.S.A. Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984). "[W]hen an agency is authorized by Congress to issue regulations and promulgates a regulation interpreting a statute it enforces, the interpretation receives deference if the statute is ambiguous and if the agency's interpretation is reasonable." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2124 (2016).

Our first step is to determine whether Congress has "directly addressed the precise question at issue." *Chevron*,

467 U.S. at 843. We conclude that it has not. The relevant statutory text directs the Service to

> (D) ensure that limited access privilege holders do not acquire an excessive share of the total limited access privileges in the program by—
>
> (i) establishing a maximum share, expressed as a percentage of the total limited access privileges, that a limited access privilege holder is permitted to hold, acquire, or use; and
>
> (ii) establishing any other limitations or measures necessary to prevent an inequitable concentration of limited access privileges.

16 U.S.C. § 1853a(c)(5)(D). That provision defines neither "excessive share" nor "maximum share," and it contains no reference to market power. Other provisions of the same section make clear that limited access privilege programs are to serve a variety of objectives. Specifically, such programs "shall . . . promote—(i) fishing safety; (ii) fishery conservation and management; and (iii) social and economic benefits." *Id.* § 1853a(c)(1)(C).

Pacific Choice points to a separate section of the Act that outlines standards for fishery management and instructs the Service to ensure that allocations of quota share are "(A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges." 16 U.S.C. § 1851(a)(4). Like section 1853a(c)(5)(D),

however, that provision does not say what Congress meant by "excessive share." And the next paragraph makes clear that although the Service must "consider efficiency" in developing fishery management measures, economic efficiency is *not* the only goal: "no such measure shall have economic allocation as its sole purpose." *Id.* § 1851(a)(5).

Pacific Choice emphasizes that the Service previously interpreted section 1851(a)(4)'s "excessive share" clause to "imply conditions of monopoly or oligopoly." 60 Fed. Reg. 61,200, 61,202 (Nov. 29, 1995). The Service's prior interpretations cannot transform otherwise ambiguous statutory text into an unambiguous command because "the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996). In any event, the Service's belief that the term "excessive share" "impl[ies]" market power is itself far from an unambiguous statement that market power must have singular importance—almost by definition, one cannot "directly address[]" an issue by implication. *Chevron*, 467 U.S. at 843.

Pacific Choice also relies on the Act's legislative history, but legislative history cannot "supply mandatory requirements not found within the [Magnuson-Stevenson Act] itself." *Pacific Coast*, 693 F.3d at 1093. Even if it could, the legislative history here does not do so. Pacific Choice points to two floor statements from individual Representatives indicating that Congress was concerned about preventing "excessive and inequitable consolidation at the expense of small-scale fishermen," 152 Cong. Rec. 23,359 (Dec. 8, 2006) (statement of Rep. Allen), and wanted to "protect[] small fishermen from those who would like to consolidate fisheries," *id.* at 23,360 (statement of Rep.

Rahall). Those statements reflect a desire to protect small fishing operations, but, like the statutory text, they do not suggest that the maximum share must be no more restrictive than necessary to avoid excessive concentration.

Because the Act is ambiguous as to what factors the Service must consider in setting a maximum share, we turn to step two of the *Chevron* framework: whether the Service has adopted a "reasonable interpretation" of the statute. 467 U.S. at 844. We have previously held that the Act gives the Service "broad discretion" to carry out its provisions. *Northwest Envtl. Def. Ctr. v. Brennan*, 958 F.2d 930, 935 n.3 (9th Cir. 1992). Congress directed the Service to consider a wide range of factors in establishing limited access privilege programs, including "the basic cultural and social framework of the fishery" and "the sustained participation of small owner-operated fishing vessels and fishing communities that depend on the fisheries." 16 U.S.C. § 1853a(c)(5)(B). In light of those objectives, it was reasonable for the Service to conclude that other factors can dictate a lower maximum share than might be required by a singular focus on preventing excessive market power—or, in other words, that the Service may attempt to do something more than act simply as a fishery-specific version of the Federal Trade Commission or the Justice Department's Antitrust Division.

Pacific Choice suggests that the Service erred in interpreting the Act to permit consideration of whether vessels would have a "chance at generating a reasonable profit." We disagree. The Act requires the Service to "include measures to assist, when necessary and appropriate, entry-level and small vessel owner-operators, captains, crew, and fishing communities." 16 U.S.C. § 1853a(c)(5)(C). While Congress noted that those measures

might "includ[e] . . . set-asides of harvesting allocations" or "economic assistance," it did not say that those actions were the only such measures the Service could adopt. *Id.* Instead, Congress left it to the Service to determine when and how assisting small vessel owner-operators might be "necessary and appropriate." *Id*. Giving weight to the chance of generating a profit was a reasonable way to implement Congress's directive.

B

Although the Service permissibly interpreted the Act, we still must ensure that the 2.7 percent maximum share is not "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). That standard is deferential: as long as an agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made,'" the Supreme Court has made clear that "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)); *accord FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009).

As an initial matter, the Service asks us to disregard Pacific Choice's objections because Pacific Choice did not raise them before the agency. Generally, a "party forfeits arguments that are not raised during the administrative process." *Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010). But we will consider any issue that was "raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised, whether the issue was considered sua sponte by the agency or was raised by someone other than the petitioning party." *Glacier Fish Co., LLC v. Pritzer*, 832 F.3d 1113, 1120 n.6 (9th Cir. 2016)

(internal quotation marks and citation omitted). Because the Service in fact examined the issues that Pacific Choice now raises, including in response to other commenters during the notice-and-comment period, we consider them on the merits.

In assessing the Service's decision, we "review the whole record," 5 U.S.C. § 706, which includes "everything that was before the agency pertaining to the merits of its decision." *Portland Audubon Soc. v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993). Pacific Choice urges us to examine only the Service's decision memoranda while ignoring the Council's materials, including analyses by the Quota Committee, the Allocation Committee, the Management Team, and the Advisory Subpanel. Although the Act requires the Service to "evaluat[e]" the Council's proposed regulations to "determine whether they are consistent with the fishery management plan" and with the Act, it does not require the Service to engage in a lengthy discussion of every aspect of the plan or to repeat points already made by the Council and its committees. 16 U.S.C. § 1854(b)(1). Instead, when the Service finds that an amendment is consistent with a fishery plan, the Act requires it to do no more than "publish such regulations in the Federal Register," along with any "technical changes as may be necessary for clarity and an explanation of those changes." *Id*. § 1854(b)(1)(A). Pacific Choice offers no authority supporting its assertion that we should focus exclusively on the Service's memoranda from the very end of the administrative process. To the contrary, we have previously upheld the Service's regulations on the basis of findings by the Council and its committees. *See Fisherman's Finest, Inc. v. Locke*, 593 F.3d 886, 896 (9th Cir. 2010).

Pacific Choice contends that the Service's decision-making process was flawed in two ways: the Service "failed

to consider an important aspect of the problem" by ignoring market power altogether, *State Farm*, 463 U.S. at 43, and it also failed to articulate "the methods by which, and the purposes for which" it set the maximum share at 2.7 percent rather than at some other percentage, *San Antonio, Tex. ex rel. City Pub. Serv. Bd. v. United States*, 631 F.2d 831, 852 (D.C. Cir. 1980). We reject both of those arguments.

First, the record shows that the Service did consider market power. After the Quota Committee completed its initial analysis based on historical aggregate revenue, the Allocation Committee examined the degree of concentration within the fishery, calculating an HHI. Relying on Department of Justice antitrust guidelines defining a concentrated market based on HHI, the Allocation Committee concluded that all of the options then under consideration—ranging from 1.5 to 5 percent—were "unlikely" to "affect market power." With the conclusion in hand that market-power considerations were unlikely to be significant factors in establishing a maximum share, the Service might have understandably decided to ignore market power.

But contrary to Pacific Choice's representations, market-power considerations and economic analyses continued to play a prominent role in the agency's consideration of the maximum share. Building on the Allocation Committee's analysis, the Management Team acknowledged the dual purposes of  setting maximum shares: the limits not only serve as "preventative measures against anticompetitive market conditions" but also "ensure that the benefits . . . arising from the public fishery resource accrue to a minimum number of [quota-share] owners." The Management Team then conducted an in-depth analysis of the degree of concentration in the fishery, projecting vessel profitability

based on varying levels of market concentration. After cautioning against the effect that higher quota-share maximums might have on "bargaining, market power, and . . . . undue influence over other aspects of the fishery," the Management Team presented a range of options from 1.3 to 3.8 percent depending on the Service's desired degree of "consolidation" within the fishery. While Pacific Choice might prefer the higher limits suggested by the Allocation Committee's HHI analysis rather than the lower ones suggested by the Management Team's economist, we see no reason to second-guess the Management Team's economic analysis.

Nor did the Management Team offer the final word on market power—the Council itself detailed its reasoning in an exhaustive overview in the 2010 environmental impact statement, which it issued jointly with the Service. While it is true that the Council stated that its quota-share limits were "aimed at more than just preventing market power or other anticompetitive situations," that is not the same as ignoring market power.

Second, we conclude that the agency engaged in a reasoned process from which its path to the 2.7 percent limit "may reasonably be discerned." *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 497 (2004) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). Pacific Choice argues that the Advisory Subpanel picked 2.7 percent only because it was the "mid range of the data presented" in the Management Team's economic analysis. Even if that were an accurate characterization of the Advisory Subpanel's recommendation, it would not necessarily establish that the Service's decision was unreasoned given the extensive discussion of Act's factors presented at each step of the

rulemaking process. We have upheld similar determinations in the past where the agency "had to choose some number from a broad range" and selected "a reasonable figure." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 616 (9th Cir. 2014); *see Missouri Pub. Serv. Comm'n v. FERC*, 215 F.3d 1, 5–6 (D.C. Cir. 2000).

In any event, Pacific Choice's interpretation of the administrative record is not persuasive. Pacific Choice misconstrues the Advisory Subpanel's recommendation, which did not state that the panel recommended 2.7 percent *because* that figure was in the middle of the Management Team's recommendations. Instead, the Advisory Subpanel adopted the Management Team's recommendation because it concluded that the "revenue-based approach . . . [was] a useful conceptual approach" for setting a maximum share. The Advisory Subpanel's recommendation is brief, but it reveals independent judgment on each aspect of the recommendations from the Allocation Committee and the Management Team, most notably on individual species limits.

More generally, we see no reason to focus only on the Advisory Subpanel's memo when it constituted just one step in the lengthy administrative process. Viewed as a whole, the record contains extensive justification for the 2.7 percent limit. As the Management Team concluded, that limit accommodates a variety of the Council's objectives for setting a maximum share, including "cap[ping] the initial allocation of quota share at a level that is consistent with" historical quota distributions on the 2003 control date, and allowing more consolidation in the fishery than a lower limit—such as 2.3 percent—would accomplish. The Service's environmental impact statement fully explains how the agency arrived at the 2.7 percent limit from the

Quota Committee's initial recommendation of 1.5 to 5 percent.

Under the APA, "we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman*, 419 U.S. at 286. We have no difficulty in following the Service's path to the 2.7 percent maximum share, and we hold that the Service did not act arbitrarily or capriciously in setting it.

IV

Pacific Choice also advances statutory and APA challenges to the Service's control rule. We reject both.

The Magnuson-Stevens Act requires that the Service "establish[] a maximum share . . . that a [share] holder is permitted to hold, acquire, or use." 16 U.S.C. § 1853a(c)(5)(D)(i). According to Pacific Choice, the Service exceeded the authority granted by that statute when it interpreted "hold, acquire, or use" to include "control" and proceeded to define "control" to include, among other things, "the ability through any means whatsoever to control or have a controlling influence over the entity to which [quota share] is registered." 50 C.F.R. §660.140(d)(4)(iii)(H). Pacific Choice argues that the rule "effectively re-writes Congress's definition" by using the word "control," which does not appear in the statute. But the word "acquire," which does appear in the statute, means "to come into possession, *control*, or power of disposal of." *Webster's Third New International Dictionary* 18 (2002) (emphasis added). If that were not enough, the word "use" easily encompasses the concept of control. *See Friends of Animals v. United States Fish & Wildlife Serv.*, 879 F.3d 1000, 1006–09 (9th Cir. 2018). Beyond that, section 1853a(c)(5)(D)(ii) gives the Service even broader authority

to establish "any other limitations or measures necessary to prevent an inequitable concentration of limited access privileges." 16 U.S.C. § 1853a(c)(5)(D)(ii).

Pacific Choice responds that we must read the statute against a background of ordinary corporate-law principles, under which a corporation is a distinct entity from its owners. We agree that Congress drafts laws while "aware of settled principles of corporate law." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003). It is also true that Congress defined the term "person" in the Act to mean "any individual . . . corporation, partnership, association, or other entity." 16 U.S.C. § 1802(36). But the Service's control rule does not purport to redefine personhood. Instead, it defines when a person "own[s] or control[s]" quota share nominally held by *other* people. 50 C.F.R. § 660.140(d)(4)(i)(A). That is in no way inconsistent with the common-law understanding of corporate ownership.

Because the Service's interpretation of "hold, acquire, or use" represents an exercise of delegated authority, our review of it is governed by *Chevron*, and we see nothing in the statute that unambiguously forecloses the Service's approach. Instead, the Service's rule represents a reasonable implementation of Congress's directive that quota allocations be "fair and equitable" and be "carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges." 16 U.S.C. § 1851(a)(4).

Nor are we persuaded that the rule is arbitrary and capricious. Pacific Choice does not identify a deficiency in the Service's rulemaking process but instead argues that the Service's definition of "control" is so broad—and thus so vague—that it constitutes an abuse of discretion. In limited situations, we have recognized that an agency might act

arbitrarily and capriciously by "fail[ing] to properly specify" its rules such that it leaves "no method by which" a regulated party "can gauge [its] performance." *Arizona Cattle Grower's Ass'n v. United States Fish & Wildlife Serv.*, 273 F.3d 1229, 1250–51 (9th Cir. 2001). This is not such a situation.

The rule is indeed broad. Its broadest provision covers any person who "has the ability through any means whatsoever to control or have a controlling influence over" an entity holding quota share. 50 C.F.R. § 660.140(d)(4)(iii)(H). But breadth is not the same thing as vagueness. *See Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998). The rule's terms have clear meanings sufficient to inform regulated entities about what types of conduct the Service will prohibit: ownership or control that evades the Service's maximum share limits. For example, clause (d)(4)(iii)(A) deems control satisfied when a person "has the right to direct . . . the business of [an] entity," clause (d)(4)(iii)(B) when a person "has the right to limit the actions of or replace" corporate officers, and clause (d)(4)(iii)(C) when a person "has the right to direct . . . the transfer of" quota share. It requires no great leap to read the more general language of clause (d)(4)(iii)(H) as prohibiting the same sort of thing. *See Yates v. United States*, 574 U.S. 528, 545 (2015).

Crucially, we see no ambiguity about whether Pacific Choice "own[ed] or control[led]" the related entities at issue here. Pacific Choice's brief discloses that each of the six entities that held quota share are wholly owned either by Frank Dulcich or by a corporation that Dulcich owns. Under any plausible definition of "control," Dulcich controls the Pacific Choice entities. Because Pacific Choice is subject to the control rule even under its narrowest construction, we

need not consider the rule's outermost limits or whether, in some other case, the Service might abuse its discretion by applying the rule in a surprising or unforeseeable way. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982) ("A plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.").

**AFFIRMED**.