**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

|  |  |
|---|---|
| BLUE MOUNTAINS BIODIVERSITY PROJECT, an Oregon non-profit corporation, | No. 22-35857 |
| | D.C. No. 2:20-cv-02158-MO |
| *Plaintiff-Appellant*, | |
| v. | ORDER AND AMENDED OPINION |
| SHANE JEFFRIES, in his official capacity as Ochoco National Forest Supervisor; UNITED STATES FOREST SERVICE, an agency of the United States Department of Agriculture, | |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the District of Oregon
Michael W. Mosman, District Judge, Presiding

Argued and Submitted March 30, 2023
Seattle, Washington

Filed July 3, 2023
Amended April 16, 2024

Before:  Jacqueline H. Nguyen and Andrew D. Hurwitz,
Circuit Judges, and Dean D. Pregerson,[*] District Judge.

Order;
Opinion by Judge Hurwitz;
Statement Respecting Denial of Rehearing En Banc by
Judge Berzon

## SUMMARY[**]

### Environmental Law

The panel filed (1) an order denying a petition for panel rehearing, denying a petition for rehearing en banc, and amending the opinion filed on July 3, 2023; and (2) an amended opinion affirming the district court's summary judgment in favor of the U.S. Forest Service in an action brought by Blue Mountains Biodiversity Project ("BMBP") alleging that the Service's approval of the Walton Lake Restoration Project violated the National Environmental Policy Act ("NEPA"), the National Forest Management Act, and the Administrative Procedure Act ("APA").

The Forest Service developed the Project to replace trees infested with laminated root rot and bark beetles with disease-resistant trees.  In May 2016, the Service contracted

---

[*] The Honorable Dean D. Pregerson, United States District Judge for the Central District of California, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

with T2, a private company, for logging to implement the decision. The Service issued a revised Environmental Assessment ("EA") in July 2020 and a revised decision notice in December 2020. BMBP filed this action challenging the 2020 decision notice. The Service filed an administrative record ("AR") in 2021.

The panel first addressed BMBP's argument that the AR was incomplete. First, BMBP argued that deliberative materials were part of the "whole record" and that a privilege log was required if they were not included in the AR. The panel held that deliberative materials are generally not part of the AR absent impropriety or bad faith by the agency. Because deliberative materials are not part of the administrative record to begin with, they are not required to be placed on a privilege log. The district court did not abuse its discretion by declining to order the production of a privilege log. Second, BMBP argued that all documents in the 2016 AR should be in the AR for this case. BMBP contended that the documents in the 2016 AR were necessarily before the agency in the 2020 process because the Project was a continuation of the withdrawn one. The panel held that BMBP's arguments failed to overcome the presumption of regularity. The 2020 decision notice expressly stated that the Forest Service began the NEPA process again in 2019. The record also supported the Service's contention that it included only documents from previous NEPA analyses that were considered in the 2020 decision. The panel concluded that the district court acted within its discretion in denying the motion to supplement the AR.

The panel next addressed whether the Service violated NEPA by approving the Project. First, the panel held that BMBP failed to establish that the logging contract with T2

improperly committed resources under any standard. There is also no evidence that the agency merely engaged in post hoc rationalization in the 2020 decision. Second, the panel rejected BMBP's contention that the EA diluted the significance of some impacts by analyzing them on too large a scale. The BMBP did not show why the choice of a broader context in the challenged instances was arbitrary or capricious. Also, the regulations list ten non-exhaustive relevant factors for consideration. The panel held that whether the factors were assessed individually or cumulatively, the record did not establish a clear error of judgment in the Service's intensity findings, which "refers to the severity of impact" within the selected context. 40 C.F.R. § 1508.27(b).

The panel affirmed the judgment of the district court and lifted the previous stay of its order dissolving the preliminary injunction.

In a statement respecting the denial of rehearing en banc, Judge Berzon, joined by Wardlaw, Paez, and Koh, wrote that the panel's holding permits government agencies to sanitize the record available to reviewing courts, thereby severely curtailing meaningful judicial review of administrative action. The panel's opinion conflicts with case law by holding that materials protected by the deliberative process privilege were not part of the "whole record" for purposes of judicial review under the APA. Judge Berzon would hold that if government agencies wish to withhold documents in APA cases based on a privilege, they should have to provide a privilege log with justification for each document for which they assert a privilege, as they must do under Freedom of Information Act precedent.

## COUNSEL

Jesse A. Buss (argued) and Bridgett A. Chevallier, Willamette Law Group, Oregon City, Oregon; Thomas C. Buchele, Earthrise Law Center, Lewis & Clark Law School, Portland, Oregon; for Plaintiff-Appellant.

Robert P. Stockman (argued) and Joan M. Pepin, Attorneys; Sean C. Duffy, Trial Attorney; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Rick Grisel, Attorney, Office of the General Counsel, United States Department of Agriculture, Portland, Oregon; Rebecca Harrison, Senior Counsel; Todd Kim, Assistant Attorney General; United States Department of Justice, Washington, D.C.; for Defendants-Appellees.

Kelly K. Simon, American Civil Liberties Union Foundation of Oregon, Portland, Oregon; Cody Wofsy, Katrina Eiland, and Hannah Schoen, American Civil Liberties Union Foundation, San Francisco, California; for Amici Curiae American Civil Liberties Union, Immigrants' Rights Project, and American Civil Liberties Union of Oregon.

J. Patrick Hunter, Southern Environmental Law Center, Asheville, North Carolina, for Amici Curiae South Carolina Coastal Conservation League, Charleston Waterkeeper, Chattooga Conservancy, MountainTrue, Wild Virginia, Conservation Law Foundation, Clinch Coalition, Virginia Wilderness Committee, Cherokee Forest Voices, and Defenders of Wildlife.

Amy van Saun, Center for Food Safety, Portland, Oregon; Andrew R. Missel, Advocates for the West, Portland, Oregon; Jennifer Best, Director, Wildlife Law Program Friends of Animals, Centennial, Colorado; for Amici Curiae Environmental Organizations and Law Professors.

**ORDER**

The opinion filed on July 3, 2023, and appearing at 72 F.4th 991, is AMENDED as follows:

At 72 F.4th at 997, add the following footnote immediately after the sentence beginning with "Deliberative documents, which are prepared to aid the decision-maker in arriving at a decision":

> "[T]he deliberative process privilege shields from disclosure documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *United States Fish and Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 267 (2021) (cleaned up); *see also F.T.C. v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984) (same). The privilege does not apply, however, to any factual information upon which the agency has relied. *In re United States*, 875 F.3d 1200, 1211-12 (9th Cir. 2017) (Watford, J., dissenting) (citing *Portland Audubon Soc'y v. Endangered Species Comm.,* 984 F.2d 1534, 1548 (9th Cir. 1993)).

At 72 F.4th at 997, delete:

> We agree, however, with the D.C. Circuit that "a showing of bad faith or improper behavior" might justify production of a privilege log to allow the district to determine

whether excluded documents are actually deliberative.

and replace with:

> But whether materials are in fact deliberative is subject to judicial review, and in appropriate circumstances district courts may order a privilege log to aid in that analysis. For example, we agree with the D.C. Circuit that "a showing of bad faith or improper behavior" might justify production of a privilege log to allow the district to determine whether excluded documents are actually deliberative.

With these amendments, the panel unanimously voted to deny the petition for panel rehearing. Judge Nguyen voted to deny the petition for rehearing en banc, and Judges Hurwitz and Pregerson so recommend.

The full court was advised of the petition for rehearing en banc. A judge of the court requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the non-recused active judges in favor of en banc consideration. Fed. R. App. P. 35. The petition for panel rehearing and rehearing en banc, **Dkt. 39,** is DENIED. No further petitions for rehearing en banc will be considered. Judges Forrest and Johnstone did not participate in the deliberations or vote in this case.

# OPINION

HURWITZ, Circuit Judge:

This case involves claims by the Blue Mountains Biodiversity Project ("BMBP") that the approval of the Walton Lake Restoration Project by the U.S. Forest Service violated the National Environmental Policy Act, the National Forest Management Act, and the Administrative Procedure Act. The district court granted summary judgment against BMBP on all claims relevant to this appeal. We affirm.

## BACKGROUND

Walton Lake is a 218-acre recreation site in the Ochoco National Forest in Oregon. The Forest Service developed the Walton Lake Restoration Project ("Project") to replace trees infested with laminated root rot and bark beetles with disease-resistant ones. In 2015, relying on a regulation that excludes the sanitation harvest of trees to control disease and insects from some National Environmental Policy Act ("NEPA") requirements, 36 C.F.R. § 220.6(e)(14) (2015), the Service issued a decision memorandum approving the Project. In May 2016, the Service contracted with T2, a private company, for logging to implement that decision. Although no logging has yet occurred, the T2 contract remains in place.

BMBP sued, challenging the 2015 decision, and the district court preliminarily enjoined the logging on October 18, 2016. The next day, the Service withdrew its decision "to allow additional analysis of the proposed activities." On October 21, 2016, the Service stated that it would undertake

"[a]dditional planning and analysis . . . with the goal of releasing an Environmental [Assessment ("EA")]."[1]

The Service issued an EA and a decision notice approving the Project in 2017 but withdrew the decision notice later that year, citing a need for "additional dialogue and analysis."  The Service issued a revised EA in July 2020 and a revised decision notice in December 2020.  The revised EA analyzed four alternatives, including a no-action alternative.  The selected alternative authorizes thirty-five acres of sanitation logging and 143 acres of commercial and noncommercial thinning to reduce the risk of wildfires and bark beetle infestation.  The 2020 decision notice stated that the Project "provides the best opportunity for long-term public enjoyment of this area, with fewer risks of falling trees, and more longevity in the large ponderosa pines that provide much of the scenic quality"; found that there would be no significant environmental impact; and made four Project-specific amendments to the Ochoco National Forest Plan.

BMBP then filed this action challenging the 2020 decision notice.  The Service filed an administrative record ("AR") in early 2021.  A magistrate judge recommended denial of BMBP's motion to compel completion of the AR and declined to order the Service to produce a privilege log, concluding that certain documents sought by BMBP were deliberative materials, and BMBP did not establish that some documents in the AR filed in response to the 2016 suit were "before the agency" in its 2020 decision.  The district judge adopted the magistrate judge's reasoning and denied

---

[1] The district court granted BMBP's motion to dismiss the 2016 suit on June 19, 2017.

the motion, but again preliminarily enjoined any logging for the Project.

The district court later granted the Service summary judgment on all but one of BMBP's claims. It concluded that the logging contract with T2 was not an "irreversible and irretrievable commitment" of resources because it could be unilaterally modified or terminated. It also held that the Service reasonably found that the Project would not have a significant environmental impact and thus reasonably declined to prepare an environmental impact statement ("EIS"). The court entered a final judgment and dissolved the preliminary injunction.[2] BMBP timely appealed, and we have jurisdiction under 28 U.S.C. § 1291.[3]

## DISCUSSION

### I.

We first address BMBP's argument that the AR is incomplete. The Administrative Procedure Act ("APA") requires us to "review the whole record," 5 U.S.C. § 706, including "all documents and materials directly or indirectly considered by agency decision-makers," *Thompson v. U.S. Dep't of Lab.*, 885 F.2d 551, 555 (9th Cir. 1989) (cleaned up). BMBP argues that deliberative materials are part of the "whole record" and that a privilege log is required if they are not included in the AR. It also contends that all documents in the 2016 AR should be in the AR for this case.

---

[2] The district court stayed its order dissolving the preliminary injunction, however, pending our decision on a motion for a stay pending appeal. We granted that stay and expedited this appeal.

[3] The Service has not appealed the district court's grant of summary judgment to BMBP on one of its NEPA claims.

A.

No previous Ninth Circuit opinion addresses whether deliberative materials are part of the "whole record." District courts in this Circuit are split on the issue. *See Save the Colorado v. U.S. Dep't of the Interior*, 517 F. Supp. 3d 890, 896–97 (D. Ariz. 2021) (collecting cases). The District of Columbia Circuit, however, has held that deliberative materials are generally not part of the AR absent impropriety or bad faith by the agency. *See Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019). We agree.

Our holding rests on two well-settled principles governing judicial review of agency action under the APA. First, "the whole record," 5 U.S.C. § 706, is ordinarily "the record the agency presents," *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). "[L]ike other official agency actions, an agency's statement of what is in the record is subject to a presumption of regularity." *Goffney v. Becerra*, 995 F.3d 737, 748 (9th Cir. 2021). Thus, barring "clear evidence to the contrary," we "presume that an agency properly designated the Administrative Record." *Id.* (cleaned up).

Second, we assess the lawfulness of agency action based on the reasons offered by the agency. *See Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983). Deliberative documents, which are prepared to aid the decision-maker in arriving at a decision, are ordinarily not relevant to that analysis.[4] *See*

---

[4] "[T]he deliberative process privilege shields from disclosure documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *United States Fish and Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 267 (2021) (cleaned up); *see*

*Oceana*, 920 F.3d at 865; *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("[I]nquiry into the mental processes of administrative decisionmakers is usually to be avoided."), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977); *Morgan v. United States*, 304 U.S. 1, 18 (1938) (noting it is "not the function of the court to probe the mental processes of the Secretary in reaching his conclusions"). Because deliberative materials are "not part of the administrative record to begin with," they are "not required to be placed on a privilege log." *Oceana*, 920 F.3d at 865 (cleaned up). But whether materials are in fact deliberative is subject to judicial review, and in appropriate circumstances district courts may order a privilege log to aid in that analysis. For example, we agree with the D.C. Circuit that "a showing of bad faith or improper behavior" might justify production of a privilege log to allow the district to determine whether excluded documents are actually deliberative. *Id.*; *see also In re United States*, 875 F.3d 1200, 1211–12 (9th Cir. 2017) (Watford, J., dissenting) (discussing potential circumstances justifying expansion of the AR), *vacated*, 138 S. Ct. 443, 445 (2017).

But, BMBP does not assert any misconduct by the Service, nor does it contend that specific documents were improperly classified as deliberative. Although we leave for another day a detailed exploration of the precise circumstances under which a district court can order the

---

*also F.T.C. v. Warner Commc'ns, Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984) (same). The privilege does not apply, however, to any factual information upon which the agency has relied. *In re United States*, 875 F.3d 1200, 1211-12 (9th Cir. 2017) (Watford, J., dissenting) (citing *Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993)).

production of a privilege log, the court here did not abuse its discretion by declining to do so in this case.

## B.

BMBP also contends that the documents in the 2016 AR were necessarily before the agency in the 2020 process because the Project is a continuation of the withdrawn one. In so arguing, BMBP cites statements by the Service suggesting that the 2020 decision relied on an "additional" NEPA analysis, a District Ranger's description of that analysis as a "continuation of the Walton Lake Restoration analysis and documentation," and the Service's reliance on a 2015 Forest Health Report before the district court and an appellate motions panel.

BMBP's arguments, however, fail to overcome the presumption of regularity. *See Goffney*, 995 F.3d at 748. The 2020 decision notice expressly stated that "[t]he Forest Service began the NEPA process again in 2019 with a scoping letter dated August 7, 2019." The phrase "additional analysis" is not inconsistent with preparing a new AR to support a new NEPA analysis. Nor do the views of a single Service employee necessarily reflect those of the agency or its ultimate decision-maker. *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 659 (2007). The record also supports the Service's contention that it included only documents from previous NEPA analyses that were considered in the 2020 decision. For example, the Service did not cite the 2015 Forest Health Report in its 2020 decision, relying instead on a new 2019 Forest Health Report. And, the Service's citations to the 2015 Report in prior court proceedings did not involve the validity of the 2020 decision but rather a separate 2017 decision to close sections of the recreation site because of safety concerns.

We place a thumb on the scale against supplementation of the AR, *see Goffney*, 995 F.3d at 747–48, and BMBP has not demonstrated how the inclusion of "over two thousand pages that the Service had included in the 2016 AR," would "identify and plug holes in the administrative record," *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010) (cleaned up). Because BMBP "has not met its heavy burden to show that the additional materials sought are necessary to adequately review the Forest Service's decision," *id.*, the district court acted within its discretion in denying the motion to supplement the AR.

## II.

We next address whether the Service violated NEPA by approving the Project. NEPA imposes "a set of action-forcing procedures that require that agencies take a hard look at [the] environmental consequences" of their actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (cleaned up). "Although these procedures are almost certain to affect the agency's substantive decision, . . . NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Id.*

## A.

The Council on Environmental Quality ("CEQ") issues regulations to guide agencies in determining what actions are subject to NEPA requirements. *See* 40 C.F.R. § 1500.3.[5] Those regulations prohibit an agency from "commit[ting] resources prejudicing selection of alternatives" or taking actions that would "[l]imit the choice of reasonable alternatives." *Id.* §§ 1502.2(f), 1506.1(a)(2). BMBP

---

[5] Unless otherwise indicated, all citations are to the 2019 version of the Code of Federal Regulations.

contends that the logging contract with T2 violated these regulations. The parties dispute whether an improper commitment of resources must be "irreversible and irretrievable," *Metcalf v. Daley*, 214 F.3d 1135, 1143 (9th Cir. 2000) (cleaned up), or something less. We need not decide that issue, however, because BMBP has failed to establish that the contract improperly committed resources under any standard.

Under the contract, T2 will receive $78,262 to remove non-commercial timber and about $36,000 worth of harvested commercial timber. Critically, the Service reserved the right to "terminate this contract, or any part hereof, for its sole convenience," at which point T2 "shall immediately stop all work." 48 C.F.R. § 52.212-4(l); *see WildWest Inst. v. Bull*, 547 F.3d 1162, 1169 (9th Cir. 2008) (stressing that the Service "clearly retained the authority to change course or to alter the plan it was considering implementing"); *see also Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 206 (4th Cir. 2005) (holding that preparatory activities did not violate NEPA in part because that they did not "include cutting even a single blade of grass in preparation for construction"). T2 has not conducted any logging under the contract because the Service has not issued a notice to proceed. And, given the district court's preliminary injunction against logging, which has been stayed pending appeal, no logging can occur until this case is resolved. *See supra* note 2. Nor has the Service made any payments to T2.

There is also no evidence that the agency "merely engaged" in "post hoc rationalization" in the 2020 decision. *Nat'l Audubon Soc'y*, 422 F.3d at 199. BMBP argues that an internal email by a Service employee suggests that termination of the contract would cost the Service

appropriated dollars and prevent funding of a new project. But, another Service employee explained in the same email chain that any future work under the contract "must adhere to what is in the new NEPA decision" and that pending the outcome of that decision, the Service might need to "terminate[ ] and resolicit[ ]" the contract.

Rather than rely on "the alleged subjective intent of agency personnel divined through selective quotations from email trails," we "look to . . . the environmental analysis itself." *Id.* The EA contains no indication that the T2 contract prejudiced or limited the consideration of alternatives. After analyzing the effects of no action and several alternatives that reduced or eliminated commercial logging, the Service chose the Project because it "best meets the Purpose and Need of Action," would "better meet the management objectives of the area," and "provides the best opportunity for long-term public enjoyment of this area." The Service also stated that it "considered all reasonable alternatives and would not be limited in choice because the final service agreement or other tool of implementation would be written to align with the final decision."

## B.

NEPA mandates an EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). An agency need not, however, prepare an EIS if it prepares an EA that "briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757–58 (2004). Significance depends on an action's "context" and "intensity." 40 C.F.R. § 1508.27. "Although . . . review under the arbitrary and capricious standard is deferential,"

an agency's finding of no significant impact is arbitrary or capricious if the petitioner has raised "substantial questions whether a project may have a significant effect on the environment." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212–14, 1216 (9th Cir. 1998) (cleaned up).

1.

"Context simply delimits the scope of the agency's action, including the interests affected." *In Defense of Animals v. U.S. Dep't of the Interior*, 751 F.3d 1054, 1068 (9th Cir. 2014) (cleaned up); *see* 40 C.F.R. § 1508.27(a) (listing potential contexts). Although the agency should be mindful "that use of a larger analysis area can dilute the apparent magnitude of environmental impacts," "[i]dentifying the appropriate geographic scope is a task assigned to the special competency of the appropriate agency." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 943 (9th Cir. 2014) (cleaned up).

BMBP contends that the EA diluted the significance of some impacts by analyzing them on too large a scale. However, "[a]lthough 40 C.F.R. § 1508.27(a) suggests that site-specific actions are generally evaluated in the context of a project locale, nothing in the regulation prohibits the [Service] from exercising its discretion to apply a [larger] analysis when appropriate." *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1127 (9th Cir. 2012). And BMBP has not shown why the choice of a broader context in the challenged instances was arbitrary or capricious. *See Ctr. for Cmty. Action & Env't Just. v. FAA*, 18 F.4th 592, 599 (9th Cir. 2021) (noting that the petitioner bears the burden of persuasion); *cf. Anderson v. Evans*, 371 F.3d 475, 489–92 (9th Cir. 2004) (explaining why the local context was

especially relevant for assessing whether the project's effects would be controversial).

Indeed, BMBP concedes in its briefing that the 2020 decision "acknowledges the highly-localized nature of the Project's effects" and that the EA contains a "*disclosure* of local impacts." The Service extensively analyzed various local impacts—including those on scenic integrity, on late and old structure stands, and on threatened and endangered species. And, the EA explained why it chose certain broader contexts for analysis in other instances. The record fails to establish that the agency's decisions about context were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## 2.

Intensity "refers to the severity of impact" within the selected context. 40 C.F.R. § 1508.27(b). The regulations list ten non-exhaustive relevant factors for consideration, including the "[u]nique characteristics of the geographic area"; the "degree to which the effects . . . are likely to be highly controversial"; the "degree to which the action may establish a precedent for future actions with significant effects"; and whether the action "threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." *Id.* Whether the factors are assessed individually or cumulatively, the record does not establish a "clear error of judgment" in the Service's intensity findings. *Blue Mountains Biodiversity Project*, 161 F.3d at 1211 (cleaned up).

Although the EA described Walton Lake as "unique" because it boasts a high number of visitors and is "the only Developed Recreation Management Area that has a lake with the combination of moist mixed conifer and dry mixed

conifer forest surrounding it," the Service reasonably found that the Project would affect neither the lake itself, nor "the diversity of tree species in the project area around Walton Lake." The Service also reasonably concluded that the Project "would not substantially affect the use of the area as a recreation site" because the infested area was already closed to recreational uses for safety reasons. And BMBP does not challenge the Service's conclusion that the Project would not affect any of the "unique" characteristics listed in the regulation. *See* 40 C.F.R. § 1508.27(b)(3).

The record also does not suggest that the Project is highly controversial. *See id.* § 1508.27(b)(4). "A project is highly controversial if there is a *substantial dispute* about the size, nature, or effect of the major Federal action," which "exists when evidence . . . casts serious doubt upon the reasonableness of an agency's conclusions." *WildEarth Guardians v. Provencio*, 923 F.3d 655, 673 (9th Cir. 2019) (cleaned up). But, a project is not rendered highly controversial simply because "qualified experts disagree." *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1335 (9th Cir. 1992). Rather, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

The Service concluded that the Project was not highly controversial because its potential effects were well-established or supported by the best available science. Citing a range of research, the Service found "no evidence that the proposed treatments would exacerbate" laminated root rot. It also decided against stump removal because of "soil disturbance" and "the high cost of removing stumps."

The scientific studies cited by BMBP do not render these findings arbitrary or capricious. One acknowledges that "an appropriate strategy" is "based on several factors"; another expresses some skepticism about sanitation harvesting but also notes the potential effectiveness of "spacing trees through thinning, by removing stumps, or by planting and managing resistant and immune trees species"; and a third does not discuss sanitation harvesting at all. Although BMBP also cites Dr. Chad Hanson's opinion that logging would "likely increase [laminated root rot] occurrence," the Service reviewed that opinion but ultimately concluded that the overall evidence weighed against its conclusions. One negative comment does not establish high controversy. *See Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1243–44 (9th Cir. 2005).

It was also reasonable for the Service to conclude that the Project is unlikely to establish a precedent for future actions. *See* 40 C.F.R. § 1508.27(b)(6). The Service explained that "no other known Developed Recreation Management Areas . . . have a laminated root rot problem on the Ochoco National Forest." The Service found that the Project is "site-specific" and "any future decision would need to go through the NEPA process." Even if other sites might one day develop similar infestation issues, that does not necessarily make this Project precedential, "especially since any other [project] would be subject to its own NEPA analysis." *WildEarth Guardians*, 923 F.3d at 674.

The Service's decision also reasonably accounted for federal, state, and local laws. *See* 40 C.F.R. § 1508.27(b)(10). Although forest plan amendments that "may create a significant environmental effect" require an EIS, there is an exception for "every plan amendment . . . that applies only to one project or activity." 36 C.F.R.

§ 219.13(b)(3).   The amendments to the Ochoco National Forest Plan at issue are each related to one project.

## CONCLUSION

We **AFFIRM** the judgment of the district court and lift our previous stay of its order dissolving the preliminary injunction.

---

BERZON, Circuit Judge, with whom WARDLAW, PAEZ, and KOH, Circuit Judges, join, respecting the denial of rehearing en banc:

The panel's holding in this case permits government agencies to sanitize the record available to reviewing courts, thereby severely curtailing meaningful judicial review of administrative action.   I respectfully disagree with this court's refusal to reconsider the panel opinion en banc.

The Administrative Procedure Act ("APA") mandates that, when considering challenges to the lawfulness of agency action, "the court shall review the whole record or those parts of it cited by a party."  5 U.S.C. § 706.  This court has long held that the "whole record" consists of all documents and materials considered by the agency before making its decision.  *See Portland Audubon Soc'y v. Endangered Species Comm.*, 984 F.2d 1534, 1548 (9th Cir. 1993); *Thompson v. U.S. Dep't of Lab.*, 885 F.2d 551, 555 (9th Cir. 1989); *see also, e.g.*, *Goffney v. Becerra*, 995 F.3d 737, 747 (9th Cir. 2021) (citing *Portland Audubon Soc'y*, 984 F.2d at 1548); *Pac. Choice Seafood Co. v. Ross*, 976 F.3d 932, 942 (9th Cir. 2020) (same).

In keeping with our precedents, the Supreme Court has never "limit[ed] the 'full administrative record' to those

materials that the agency unilaterally decides should be considered by the reviewing court." *In re United States*, 583 U.S. 1029, 138 S. Ct. 371, 372 (2017) (Breyer, J., dissenting from the grant of a stay). "[J]udicial review cannot function if the agency is permitted to decide unilaterally what documents it submits to the reviewing court as the administrative record." *Id.* That is because "[e]ffective review depends upon the administrative record containing all relevant materials presented to the agency, including not only materials supportive of the government's decision but also materials contrary to the government's decision." *Id.*[1]

In conflict with our case law, the decision here holds that materials protected by the deliberative process privilege are not part of the "whole record" for purposes of judicial review under the APA. *Blue Mountains Biodiversity Project v. Jeffries*, 72 F.4th 991, 996–97 (9th Cir. 2023). The deliberative process privilege applies to "documents that reflect advisory opinions, recommendations and deliberations comprising part of a process by which government decisions and policies are formulated," but does not protect "[p]urely factual material." *F.T.C. v. Warner Commc'ns Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984).

According to the panel opinion, because deliberative documents are—says the panel—not part of the "whole record," the government ordinarily need not prepare a privilege log indicating the basis for excluding "deliberative" documents as privileged. *Blue Mountains*, 72 F.4th at 997. Under the opinion, absent a *showing* of bad

---

[1] As I explain later, although in dissent as to the stay, Justice Breyer later joined the unanimous merits opinion in *In re United States*, 583 U.S. 29, 31–32 (2017) (per curiam), which was consistent with the analysis in his stay dissent. *See infra* at Part I.

faith or impropriety (or perhaps some other exception, not articulated), the government may routinely and unilaterally withhold all documents it deems "deliberative" without providing any account to the court or the litigants of the basis for excluding those documents. That holding is not only wrong but is likely to reduce APA review in many instances to a charade.

## I.

In *In re United States*, the federal government advanced in the Supreme Court the same position taken by the opinion in this case: that review of agency decisions under the APA "must be based exclusively on the documents that the Government itself unilaterally selected for submission to the District Court." *In re U.S.*, 138 S. Ct. at 372 (Breyer, J., dissenting from the grant of a stay). The district court in *In re United States* had determined that the record designated by the government was incomplete, and so ordered the government to complete the administrative record and produce a privilege log. *See Regents of Univ. of California v. U.S. Dep't of Homeland Sec.*, No. C 17-05211 WHA, 2017 WL 4642324, \*7–8 (N.D. Cal. Oct. 17, 2017). After we upheld the district court's decision on mandamus review, *In re United States*, 875 F.3d 1200 (9th Cir. 2017), the government sought review in the Supreme Court. The Supreme Court granted a stay to consider the government's mandamus request. *In re U.S.*, 138 S. Ct. at 371. Joined by three justices in dissent from the grant of the stay Justice Breyer maintained that the Supreme Court has never held that the "whole record" in APA cases is whatever documents the government unilaterally designates as the administrative record. *In re U.S.*, 138 S. Ct. at 372.

The Supreme Court subsequently granted certiorari and issued a unanimous opinion in *In re United States*. 583 U.S. 29 (2017) (per curiam). That opinion allowed the district court's order to remain in place and declined to adopt the government's view of its unilateral power to designate the administrative record. *Id*. at 31–32.

More specifically, the Court in *In re United States* held that the district court should have first resolved two threshold jurisdictional arguments that "if accepted, likely would eliminate the need for the District Court to examine a complete administrative record." *Id*. at 31–32. But the Court did not disapprove the district court's order directing the government to complete the administrative record and produce a privilege log. *See id*. at 32. Instead, the Court explained that if the threshold arguments were resolved in favor of the district court's jurisdiction, then the district court "may consider whether narrower amendments to the record are necessary and appropriate." *Id*. The Supreme Court further indicated that the district court could potentially "compel the Government to disclose [] document[s] that the Government believes is privileged" so long as the court "first provid[es] the Government with the opportunity to argue the issue." *Id*.

In other words, consistent with Justice Breyer's earlier dissent from the stay order, the Supreme Court's unanimous opinion made clear that the district court had power either to maintain its existing order for completion of the administrative record and production of a privilege log, or to "narrow[]" it, as long as the government had a chance to litigate the question of privilege. *Id*. The Supreme Court's merits opinion did *not* hold—as did the panel opinion in this case—that the district court was precluded from expanding the record at all, absent a showing of some unusual

circumstance, or that the agency could decide for itself which material was deliberative.  And Justice Breyer obviously understood the merits opinion as consistent with the analysis in his earlier stay dissent—an analysis squarely contrary to the panel opinion in this case—as he joined the merits opinion.

## II.

In keeping with the view that prevailed in *In re United States*, our Circuit has repeatedly held that for purposes of APA review, "'[t]he whole record' includes *everything* that was before the agency pertaining to the merits of its decision."  *Portland Audubon Soc'y*, 984 F.2d at 1548 (emphasis added).  *See also, e.g.*, *Pac. Choice Seafood Co.*, 976 F.3d at 942 (same); *Goffney*, 995 F.3d at 747 (same); *Thompson*, 885 F.2d at 555.

Our requirement that the administrative record be complete is critical for effective judicial review.  In APA agency review cases, private parties may not introduce new facts, and discovery is ordinarily not available.  As the Supreme Court has observed, "the focal point for judicial review" in APA cases "should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  "[T]he general rule [is] that agency actions are to be judged on the agency record alone, without discovery."  *Pub. Power Council v. Johnson*, 674 F.2d 791, 794 (9th Cir. 1982).

Our Circuit law is clear that, given that judicial review is limited to the administrative record, the administrative record must be complete.  "If the record is not complete, then the requirement that the agency decision be supported by 'the record' becomes almost meaningless."  *Portland*

*Audubon Soc'y*, 984 F.2d at 1548; *accord In re United States*, 138 S. Ct. at 372 (Breyer, J., dissenting from the grant of a stay). Accordingly, *Portland Audubon Society* explained that "a record that does not include all matters on which the [agency] relied does not constitute the 'whole record' required for judicial review," and "the failure to include all materials in the record violates the Administrative Procedure Act." *Id.* at 1536–37. Further, "[w]hen it appears the agency has relied on documents or materials not included in the record, supplementation is appropriate." *Id.* at 1548.

*Thompson* similarly held that "[t]he whole administrative record . . . is not necessarily those documents that the *agency* has compiled and submitted as 'the' administrative record." 885 F.2d at 555; *see also Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993) ("An agency may not unilaterally determine what constitutes the Administrative Record"). Instead, "[t]he 'whole' administrative record . . . consists of all documents and materials directly or *indirectly* considered by agency decision-makers and includes evidence contrary to the agency's position." *Thompson*, 885 F.2d at 555 (internal quotation marks and citation omitted).

More recently, in *Pacific Choice Seafood Company*, we rejected an argument that in reviewing a National Marine Fisheries Service decision, we should "examine only the Service's [final] decision memoranda while ignoring" earlier materials, analyses, and reports produced by a regional fishery management council during a "years-long deliberative process" that preceded the Service's final decision. 976 F.3d at 936, 942. Emphasizing that the "whole record" includes "everything that was before the agency," we noted that the plaintiff "offer[ed] no authority supporting its assertion that we should focus exclusively on

the Service's memoranda from the very end of the administrative process." *Id.* at 942. *See also id.* at 943 (relying in part on "the extensive discussion of [applicable] factors presented at each step of the rulemaking process" in concluding that the agency had engaged in reasoned decisionmaking).

Consistent with these precedents, we have routinely reviewed letters, drafts, emails, and other nonfinal materials in the course of evaluating the lawfulness of agency action. For example, *Barnes v. U.S. Department of Transportation*, 655 F.3d 1124 (9th Cir. 2011), considered a statement made by a Federal Aviation Authority ("FAA") official while commenting on a draft document related to an environmental assessment of a new airport runway. *Id.* at 1133. The government contended that we should disregard the statement because it was "made in the early stages of the administrative process" and "that courts must focus on the final action by an agency." *Id.* We disagreed, explaining that the Supreme Court has not held that "such preliminary determinations are irrelevant in any context . . . or that they may not be considered when reviewing an agency action." *Id.* at 1134. We also considered "a series of emails in the administrative record" reflecting concerns raised by FAA employees about the proposed project. *Id.* at 1135. *See also*, *e.g.*, *Native Village of Point Hope v. Jewell*, 740 F.3d 489, 499–501 (9th Cir. 2014) (considering "internal [agency] emails," draft tables or charts, and commentary by agency staff on proposed scenarios); *Earth Island Institute v. Hogarth*, 494 F.3d 757, 768–69 (9th Cir. 2007) (relying on an administrative record that included "internal memoranda" as well as draft "talking points").

The holding here that the "whole record" does not include deliberative material cannot be reconciled with these

precedents. Under our case law, drafts and other non-final documents may properly be reviewed by the court as part of the "whole record," unless the government justifies its decision to withhold such documents in a privilege log.

### III.

Aside from creating an intracircuit conflict, the reasons provided in the opinion in support of its holding on the administrative record issue are seriously flawed.

### A.

The opinion "rests" in part on the principle that "an agency's statement of what is in the record is subject to a presumption of regularity." *Blue Mountains*, 72 F.4th at 996–97. But the presumption of regularity is a presumption that the agency has done what it is supposed to do; it does not tell us what the agency is supposed to do. More specifically, the presumption does not describe the breadth of the record that should be produced and so does not explain to what the presumption attaches. That is, if the legal rule is that the record is everything that was before the agency (as our precedents have long held), then we can presume—but not conclusively—that what is presented was everything before the agency. So the presumption has nothing to do with what is actually in an appropriate administrative record in the first instance.

### B.

The opinion also reasons that "[d]eliberative documents, which are prepared to aid the decision-maker in arriving at a decision, are ordinarily not relevant" to judicial review of the lawfulness of agency action. *Blue Mountains*, 72 F.4th at 997. In support of this proposition, the opinion relies on *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S.

402, 420 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977), and *Morgan v. United States*, 304 U.S. 1, 18 (1938). *See Blue Mountains*, 72 F.4th at 997. Neither case supports the panel's conclusion.

*Overton Park* involved a challenge to the Secretary of Transportation's decision to authorize the construction of a highway through a public park. 401 U.S. at 406. In announcing his decision, the Secretary made no formal findings. 401 U.S. at 407–08. The Supreme Court explained that judicial "review is to be based on the full administrative record that was before the Secretary at the time he made his decision." *Id.* at 420. But because of the inadequacy of the existing record in that case, the Court held that post-decisional fact development was perhaps necessary for effective judicial review:

> The court may require the administrative officials who participated in the decision *to give testimony explaining their action*. Of course, *such inquiry* into the mental processes of administrative decisionmakers is usually to be avoided. . . . And where there are administrative findings that were made at the same time as the decision, . . . there must be a strong showing of bad faith or improper behavior before *such inquiry* may be made. But here there are no such formal findings and it may be that the only way there can be effective judicial review is by examining the decisionmakers themselves.

*Id.* (emphasis added) (citing *United States v. Morgan*, 313 U.S. 409, 422 (1941) (hereinafter *Morgan II*)).

Similarly, in *Morgan*, after the district court received testimony from the Secretary of Agriculture about his decisional process, the Supreme Court observed that "it was not the function of the court to probe the mental processes of the Secretary in reaching his conclusions if he gave the hearing which the law required." 304 U.S. at 14, 18; *see also Morgan II*, 313 U.S. at 422.**[2]**

Thus, both cases concern the propriety of *post-decisional* testimony of administrative decisionmakers, which obviously was not part of the administrative record because it did not exist at the time the agency made its decision. *See In re United States*, 138 S. Ct. at 373 (Breyer, J., dissenting from the grant of a stay). "Probing a decisionmaker's subjective mental reasoning—what was at issue in *Morgan* and *Overton Park*—is distinct from the ordinary judicial task of evaluating whether the decision itself was objectively valid, considering all of the materials before the decisionmaker at the time he made the decision." *Id*. Neither *Morgan* or *Overton Park* concerns the scope of the administrative record reviewed under the APA or supports the conclusion that deliberative documents actually before the agency when reaching its decision are not part of the administrative record. Nor do they concern the circumstances warranting a privilege log.

## C.

The opinion also heavily relies on the D.C. Circuit's decision in *Oceana, Inc. v. Ross*, 920 F.3d 855 (D.C. Cir.

---

[2] The Supreme Court in *Morgan*, a case concerning an adjudicative proceeding, reversed the district court's decision because the plaintiffs were not provided with sufficient information about the government's position to satisfy the requirement of a full and fair hearing. *Morgan*, 304 U.S. at 18–19, 22.

2019). *Blue Mountains*, 72 F.4th at 996–97. *Oceana*, in turn, relied on *In re Subpoena Duces Tecum Served on Off. of Comptroller of Currency*, 156 F.3d 1279, 1279–80 (D.C. Cir. 1998) (opinion on petition for rehearing). And *In re Subpoena Duces Tecum* relied on *Morgan*, *Overton Park*, and *Camp* in concluding that "[a]gency deliberations *not part of the record* are deemed immaterial." *Id*. at 1279–80 (emphasis added). That statement indicates that agency deliberations can be "part of the record," and says nothing about the treatment of agency deliberations that *are* part of the record.

Yet, *Oceana* seized on this statement—which like the Supreme Court cases the panel opinion in this case cites, references *extra-record* discovery into the decisionmaker's subjective motivations—to conclude that deliberative documents that *were* before the agency are not part of the administrative record. *See* 920 F.3d at 865 (citing *In re Subpoena Duces Tecum*, 156 F.3d at 1279, 1280). As far as I can tell, no other Circuit has adopted the D.C. Circuit's wrongheaded approach. Moreover, as discussed, *Oceana*'s conclusion conflicts with our Circuit's controlling precedents.

*Oceana* also asserts that "[b]ecause predecisional documents are 'immaterial,' they are not 'discoverable.'" 920 F.3d at 865 (citation omitted). But the concept of discoverability has no bearing on the meaning of the "whole record" for APA cases. Again, discovery is ordinarily not available in APA review cases. *See supra* at Part II. As the "whole record" is not determined through discovery, the discovery-related concept of "relevan[ce]," *see* Fed. R. Civ. Proc. 26(b)(1), is not helpful for purposes of defining the "whole record." Instead, as our case law reflects, the "whole record" consists of everything that was "directly or indirectly

considered" by the agency. *Thompson*, 885 F.2d at 555 (emphasis and quotation marks omitted).

## IV.

In other key respects as well, the decision in this case is damaging to judicial review of agency action. The opinion sets a new baseline in which the government need not justify its claims of privilege except in limited circumstances, as yet unexplained. Without a privilege log, however, governmental mistakes or misconduct are unlikely to come to light. The panel's holding also creates a tension with Freedom of Information Act ("FOIA") case law, which requires the government to supply a privilege log to justify withholding of documents claimed to be deliberative. And the decision fails to acknowledge that deliberative materials are central in cases in which the decisionmaker's subjective intent is properly at issue. *See, e.g. Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573–74 (2019).

## A.

Although the opinion purports to "leave for another day a detailed exploration of the precise circumstances under which a district court can order the production of a privilege log," it concludes that the district court properly declined to order a privilege log here because Blue Mountains Biodiversity Project "does not assert any misconduct by the Service, nor does it contend that specific documents were improperly classified as deliberative." *Blue Mountains*, 72 F.4th at 997.

Absent a privilege log, it is very unlikely—absent public announcements or a leak by government officials—that litigants will be able to point to "specific" documents improperly excluded. The reason is obvious—they will be

unaware that such documents exist.  *See, e.g.*, *Inland Empire-Immigrant Youth Collective v. Nielsen*, No. EDCV 17-2048 PSG SHKx, 2019 WL 13240629, at *6 (C.D. Cal. Apr. 8, 2019) ("[I]t would be very difficult, if not impossible, for an APA plaintiff to challenge a claim of deliberative process privilege or to make the required showing of need necessary to overcome the privilege without at least some description of the document over which privilege is asserted."); *Sierra Club v. Zinke*, No. 17-CV-07187-WHO, 2018 WL 3126401, at *5 (N.D. Cal. June 26, 2018) ("The only way to know if privilege applies is to review the deliberative documents in a privilege log.").

Importantly, agencies may inadvertently omit material from the administrative record without acting in bad faith. In *Bartell Ranch LLC v. McCullough*, No. 3:21-CV-00080-MMD-CLB, 2022 WL 2093053, at *3 (D. Nev. June 10, 2022), for example, the Bureau of Land Management had a practice of assuming that only the documents that individual agency staff had added to a case file as they were generated should be produced as the record, and that all documents *not* added to the case file were deliberative.  *Id*.  As a result of that practice, neither the agency nor its counsel looked outside the case file for record documents, nor did they make any individualized determinations about whether the six to eight thousand emails they excluded were actually deliberative.  *Id*.  Had the court not ordered the agency to provide a privilege log, the agency's error would never have come to light.  *Id*.

An agency may also make a legal error in determining which documents to exclude, such as when it applies an incorrect legal standard when compiling the record.  *See, e.g.*, *Inland Empire-Immigrant Youth Collective*, 2019 WL 13240629, at *4 (recognizing that "[t]he application of an

incorrect standard" provides reason to believe the record produced by the agency is incomplete) (quotation marks and citation omitted).  The possibility that the agency may apply an incorrect legal standard in excluding deliberative material from the administrative record is far from theoretical. Without the understanding that the "whole record" includes deliberative material and may require a privilege log identifying such material, errors of this kind will remain hidden from the litigants and the court, and the outcome of the case could well be affected.

For these reasons, if the government wishes to exclude from the record material before the agency as deliberative, it should have to identify those specific documents and justify their exclusion in a log provided to the court.

## B.

The process just described is the one we have long followed in cases under another provision of the APA—the Freedom of Information Act—when the government claims that deliberative material is exempt from disclosure.  There is no reason the process should be different here.

"The statute known as the FOIA is actually a part of the Administrative Procedure Act (APA)."  *U.S. Dep't of Just. v. Reps. Comm. For Freedom of Press*, 489 U.S. 749, 754 (1989).  FOIA Exemption 5 permits the government to avoid disclosure of "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."    5 U.S.C. § 552(b)(5).  This exemption "allows agencies to withhold privileged information, including documents revealing an agency's deliberative process."  *Transgender L. Ctr. v. Immigr. & Customs Enf't*, 46 F.4th 771, 782 (9th Cir. 2022).

Under FOIA, the government has the burden of demonstrating that a claimed privilege applies. *See id.* at 781; 5 U.S.C. § 552(a)(4)(B). "[O]ur caselaw . . . demands a careful document-by-document review" to determine whether the agency has met its burden to show that the deliberative process privilege applies. *Transgender L. Ctr.*, 46 F.4th at 786. To aid the court's determination, government agencies seeking to avoid disclosure of public records must submit a "*Vaughn* index," which "'identif[ies] the documents withheld, the FOIA exemptions claimed, and a particularized explanation of why each document falls within the claimed exemption.'" *Id*. at 781 (quoting *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 989 (9th Cir. 2009)); *see Vaughn v. Rosen*, 484 F.2d 820, 826–28 (D.C. Cir. 1973). "[T]he purpose of the index is . . . to afford the requester an opportunity to intelligently advocate release of the withheld documents and to afford the court an opportunity to intelligently judge the contest." *Transgender L. Ctr.*, 46 F.4th at 782 (quotation marks and citation omitted).

In FOIA cases, the deliberative process privilege is not absolute. Instead, "[w]e have held that '[a] litigant may obtain deliberative materials if his or her need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure.'" *Karnoski*, 926 F.3d at 1206 (quoting *Warner*, 742 F.2d at 1161); *see also* 5 U.S.C. § 552(a)(8)(A)(i)(I). There is no basis in the APA for providing litigants challenging agency action with *less* access to public documents than is available to interested members of the public under FOIA. Notably, APA review requires consideration of the "whole record," with no express exceptions, 5 U.S.C. § 706, whereas FOIA includes

several express exemptions to public access, 5 U.S.C. § 552(b).

The incongruity between FOIA and the APA, 5 U.S.C. § 706, created by the panel's decision is seriously inefficient for litigants, agencies, and the courts. To obtain access to the complete administrative record or identify what documents may exist, litigants seeking to challenge agency action will first have to file FOIA requests and then litigate the agency's decision to claim a FOIA exemption, potentially running into statute of limitations problems for the APA action while the FOIA process inches forward. Agencies will have to respond to and litigate those FOIA requests. And the courts will have to resolve both FOIA claims and APA challenges.

## C.

Finally, but importantly, an agency's subjective motivations sometimes *are* critical in APA cases. In cases in which the legal claim places the agency's subjective intent directly at issue—such as a claim that plausibly alleges that the decisionmaker's intent was discriminatory or retaliatory—deliberative materials actually considered will be central to judicial review. Such materials can be identified only if included in the whole record and, if appropriate, a privilege log.

The opinion does not except such cases from the rule it establishes about the limited scope of the administrative record. Yet the D.C. Circuit's decision *In re Subpoena Duces Tecum*, relied on by *Oceana*, held that in cases that "directly call into question the agency's subjective intent," the subjective motivation of the decisionmakers *is* at issue, and the deliberative process privilege is inapplicable. *See* 156 F.3d at 1280; *see also In re Subpoena Duces Tecum*

*Served on Off. of Comptroller of Currency*, 145 F.3d 1422, 1424 (D.C. Cir.), on reh'g, 156 F.3d 1279 (D.C. Cir. 1998).

*Department of Commerce* likewise reflects that inquiry into an administrative agency's mental processes *is* permitted where the decisionmakers' motives are at issue. There, the Supreme Court held that inquiry into a decisionmaker's "mental processes" was appropriate where there was evidence in the administrative record that the Secretary of Commerce's stated reasons for his decision were pretextual. 139 S. Ct. at 2573–74. *Department of Commerce* reflects that the decisionmaker's subjective motivations are at issue when the claim is that the agency's stated reasons for its decision were "contrived." *See id*. at 2575–76. It follows that when such claims are alleged, deliberative documents *are* directly on point and, for that reason as well as those generally applicable, may not be excluded from the administrative record.

The holding in this case that "deliberative materials are 'not part of the administrative record to begin with,'" and that only "the reasons offered by the agency" matter, *Blue Mountains*, 72 F.4th at 997, contains no recognition that this rule would fatally undermine cases in which the basis for the challenge to the agency's decision is that there were *other* reasons, not expressed in the official explanation of the agency's decision, that were actually determinative. The recognition that there may be unspecified circumstances in which challengers may be able to come forward with evidence of bad faith or impropriety and then have access to deliberative material does not fill that gap. Without access to the "whole record," including a privilege log of assertedly deliberative material, the only way to begin to make a showing of illicit motivation or pretext would be through

public statements by decisionmakers or leaks from government insiders.

\* \* \*

In sum, if government agencies wish to withhold documents in APA cases based on a privilege, they should have to provide a privilege log with a justification for each document for which they assert a privilege, as they must do under our FOIA precedents. Without a complete record or a privilege log to aid in the determination of whether the record is complete, government agencies will have the last word on what information other litigants and the court may see, and effective judicial review of government action under the APA will be severely undermined. Our court should have heard this case en banc to eliminate this serious threat to meaningful judicial review of agency action.